[No. B130244. Second Dist., Div. Three. Apr. 27, 2000.]

BARBARA BEACH-COURCHESNE et al., Plaintiffs and Appellants, v. CITY OF DIAMOND BAR et al., Defendants and Respondents.

COUNSEL

Kane, Ballmer & Berkman, Murray O. Kane and R. Bruce Tepper, Jr., for Plaintiffs and Appellants.

Hyde, Miller, Owen & Trost, Nancy C. Miller, Phillip L. Isenberg and Kirk E. Trost for the Counties of Riverside, Humboldt, Santa Clara, Merced, Madera, Fresno and Tulare as Amici Curiae on behalf of Plaintiffs and Appellants.

Richards, Watson & Gershon, Gregory M. Kunert and T. Peter Pierce for Defendants and Respondents.

Law Office of Peter E. Tracy, Peter E. Tracy and Stephen M. Place for the Cities of Mammoth Lakes, Alameda, Avalon, Bishop, Burbank, Calipatrio, Cupertino, Delano, Hayward, Hollister, Lakewood, Long Beach, Monterey, Palm Desert, Ripon, San Diego, San Rafael, Sanger and Truckee as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**KLEIN, P. J.**—Plaintiffs and appellants Barbara Beach-Courchesne, Norman Beach-Courchesne, Joyce K. Birrell, Kathryn Irene Brown, David R. Busse, Mary F. McCormick-Busse, Frank J. Dursa, Michael M. Graves, Stephen E. Nice, Janet S. Nice, Rev. Dr. Larry Rhodes and Guillermo Romero (plaintiffs) appeal a judgment denying their petition for writ of mandate, wherein they sought to set aside the decision of the Diamond Bar City Council adopting a redevelopment plan.[1]

The essential issue presented is whether substantial evidence supports the trial court's decision upholding the city's redevelopment plan.

We conclude there is no substantial evidence that the project area is blighted, which is a prerequisite under the Community Redevelopment Law (CRL). (Health & Saf. Code, §§ 33000 et seq., 33030.)[2] Therefore, the judgment is reversed with directions to invalidate the plan.

---

[1]Nineteen California cities (Mammoth Lakes, Alameda, Avalon, Bishop, Burbank, Calipatrio, Cupertino, Delano, Hayward, Hollister, Lakewood, Long Beach, Monterey, Palm Desert, Ripon, San Diego, San Rafael, Sanger, and Truckee) filed an amicus curiae brief in support of the City of Diamond Bar, while seven counties (Riverside, Humboldt, Santa Clara, Merced, Madera, Fresno and Tulare) filed an amicus curiae brief in support of plaintiffs.

[2]All further statutory references are to the Health and Safety Code, unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

a. *Background.*

Diamond Bar, comprised of rolling hills and valleys, is located at the junction of two major Southern California freeways (57 and 60) in southeastern Los Angeles County. It developed mainly as individual and unrelated single family residential tracts, with a minimal amount of commercial and other nonresidential uses. The city incorporated in 1989, after developing under the jurisdiction of Los Angeles County for nearly 30 years.

Diamond Bar is an affluent suburban community, with a median income of about $66,000 per year, average home prices exceeding $300,000, and a relatively low crime rate. Nonresidential uses, including schools and parkland, comprise about 20 percent of the city's land area. Commercial uses occupy a mere 2 percent of the city's land area and are mainly located along Diamond Bar Boulevard and portions of Golden Springs Drive.

b. *The 1995 general plan identified redevelopment as a means of mitigating traffic and financing improvements.*

On July 25, 1995, the city adopted a general plan which found: "There is a need to encourage a variety of new or expanded commercial uses and other non-residential development, as well as investigate other funding mechanisms, to help finance City services, infrastructure and amenities." The general plan noted the city's need to increase its revenues, as well as various possible approaches: "[T]he City could attempt to increase property tax revenues by establishing Diamond Bar as an exclusive community. This might be accomplished by significantly lowering allowable densities on remaining vacant land and encouraging development of remaining vacant lands as gate-guarded communities. While resale and new houses in the City command fairly high prices (slightly over $300,000), market research shows that home prices must exceed half a million dollars before property tax revenues approach municipal costs for service. . . . [¶] A second source of additional revenue to the City is sales taxes generated by existing or new local businesses. In general, market research shows that retail commercial uses generate significantly more municipal revenues as compared to costs."

The 1995 general plan did not identify any physical or economic blight in the city. However, the general plan set as a strategy that the city "[i]nvestigate and, if feasible, initiate the establishment of a redevelopment agency in the City of Diamond Bar to facilitate the mitigation of traffic and circulation deficiencies, the financing of public improvements and other similar tasks."

c. *The city pursues the redevelopment strategy.*

In April 1996, the city council retained the services of Rosenow Spevacek Group, Inc. (RSG), a redevelopment consulting firm, to evaluate the feasibility of redevelopment in the city. The feasibility study was prepared and presented to the city council in September 1996.

The process culminated on July 15, 1997, when, pursuant to the CRL, the Diamond Bar City Council adopted an ordinance approving a redevelopment project involving 1,300 acres of land. The city council made findings that the project area suffers from physical and economic blight and that the blight is "so prevalent and so substantial that it causes a reduction of, and lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." The duration of the redevelopment plan is 30 years and it is estimated that over the life of the plan, $405 million in tax increment revenues will be generated from the project area.[3]

d. *Proceedings.*

On August 1, 1997, plaintiffs filed a complaint against the city and the Diamond Bar Redevelopment Agency (Agency) to determine the validity of the redevelopment plan and for declaratory and injunctive relief. Plaintiffs alleged, inter alia, there was a lack of substantial evidence to support a finding of blight in the project area or a finding that the area is predominantly urbanized. Trial was had on September 18, 1998, at which time the matter was taken under submission.

e. *Trial court's ruling.*

On January 11, 1999, nearly four months after taking the matter under submission, the trial court issued a terse minute order which stated: "Writ of Mandate is denied. The Court finds that there is 'substantial evidence' to support the City Council's determination, using the appropriate statutory definitions, that, at least: 1) the Diamond Bar project area is 'blighted' and

---

[3]Tax "[i]ncrement revenue, which is the primary source of funding for redevelopment projects, consists of the increased property tax revenue resulting from rises in the assessed valuation of property in a redevelopment project area. Taxing agencies continue to receive the amount of revenue they would have received under the assessed valuation existing at the time the project was approved, while the additional revenue attributable to the project is placed in a special fund of the redevelopment agency for repayment of indebtedness incurred in financing the project. [Citation.]" (*County of Santa Clara v. Redevelopment Agency* (1993) 18 Cal.App.4th 1008, 1011 [22 Cal.Rptr.2d 868].)

that the project area is either blighted for necessary for effective development [*sic*]; 2) the project area is predominantly urbanized; 3) the project area is plagued by both physical and economic conditions which are so serious and substantial that neither private investment nor governmental action will alleviate those conditions; and 4) the City met all procedural requirements for adoption of the Plan."

The trial court also indicated it had reviewed the administrative record, had viewed a videotape lodged by plaintiffs, and had read and considered all arguments of the parties.[4]

Plaintiffs filed a timely notice of appeal from the judgment in favor of the city and the Agency.

## CONTENTIONS

Plaintiffs contend the project area is not blighted because: there is no basis for a finding of either physical blight or economic blight; the finding of inadequate infrastructure is not cognizable under section 33030, subdivision (c); there is no support for the finding of urbanization; there is no evidentiary support for the finding that the predominantly unblighted portions of the project area are necessary for effective redevelopment; and the private enterprise finding is unsupported by substantial evidence. Further, the public improvements proposed by the redevelopment plan do not address issues of blight.

## DISCUSSION

1. *Standard of appellate review.*

■ It was the role of the trial court to apply the substantial evidence test in reviewing the city's determination that the project area was predominantly urbanized and blighted. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 39-41 [37 Cal.Rptr. 74, 389 P.2d 538]; *County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616, 619 [76 Cal.Rptr.2d 606] (*County of Riverside*).)

Our role, in turn, is to examine whether substantial evidence supports the trial court's determinations in that regard. (*County of Riverside, supra,* 65 Cal.App.4th at p. 620.)

---

[4]This court feels compelled to comment that it viewed the plaintiffs' videotapes in their entirety and did not perceive anything remotely resembling blight. The videotapes depicted modern, well-maintained retail and office structures, amidst ample landscaping and open space in a partially rustic setting.

## 2. *Statutory scheme.*

██ The Supreme Court has cautioned that " '[p]ublic agencies and courts both should be chary of the use of the [redevelopment] act unless, . . . there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan.' " (*Sweetwater Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270, 278 [133 Cal.Rptr. 859, 555 P.2d 1099].) Thus, the concededly desirable goal of improving an area is "insufficient by itself to justify use of the extraordinary powers of community redevelopment. If it were, tax increment financing at public expense would become commonplace as a subsidy to private enterprise." (*Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 979 [139 Cal.Rptr. 196].)

A determination of blight is a prerequisite to invoking redevelopment. (§ 33030; *Gonzales v. City of Santa Ana* (1993) 12 Cal.App.4th 1335, 1342 [16 Cal.Rptr.2d 132].) Section 33031 defines the physical and economic conditions that constitute blight. It states: "(a) *This subdivision describes physical conditions that cause blight*: [¶] (1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions can be caused by serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors. [¶] (2) Factors that prevent or substantially hinder the economically viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors. [¶] (3) Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area. [¶] (4) The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership. [¶] (b) *This subdivision describes economic conditions that cause blight*: [¶] (1) Depreciated or stagnant property values or impaired investments, including, but not necessarily limited to, those properties containing hazardous wastes that require the use of agency authority as specified in Article 12.5 (commencing with Section 33459). [¶] (2) Abnormally high business vacancies, abnormally low lease rates, high turnover rates, abandoned buildings, or excessive vacant lots within an area developed for urban use and served by utilities. [¶] (3) A lack of necessary commercial facilities that are normally found in neighborhoods, including grocery stores, drug stores, and banks and other lending institutions. [¶] (4) Residential overcrowding or an excess of bars, liquor stores, or other businesses that cater

exclusively to adults, that has led to problems of public safety and welfare. [¶] (5) A high crime rate that constitutes a serious threat to the public safety and welfare." (Italics added.)

Section 33030 provides: "(b) A blighted area is one that *contains both of the following*: [¶] (1) An area that is *predominantly urbanized*, as that term is defined in Section 33320.1,[5] *and is an area in which the combination of conditions set forth in Section 33031 is so prevalent and so substantial* that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment. [¶] (2) An area that is characterized by either of the following: [¶] (A) *One or more* conditions set forth in any paragraph of subdivision (a) of Section 33031 [physical blight] and *one or more* conditions set forth in any paragraph of subdivision (b) of Section 33031 [economic blight]. [¶] (B) The condition described in paragraph (4) of subdivision (a) of Section 33031. [¶] (c) A blighted area also may be one that contains the conditions described in subdivision (b) and is, in addition, characterized by the existence of inadequate public improvements, parking facilities, or utilities." (Italics added.)

3. *Substantial evidence supports trial court's determination the project area is urbanized.*

■ The city council found the project area is predominantly urbanized within the meaning of section 33320.1, subdivision (b). It specifically found of the 1,300 acres in the project area, approximately 1,225 acres are developed for urban uses or are an integral part of an urban area. The trial court found there was substantial evidence to support the city council's determination the project area is predominantly urbanized. We examine whether substantial evidence support the trial court's determination. (*County of Riverside, supra*, 65 Cal.App.4th at p. 620.)

a. *General principles.*

■ In reviewing a trial court's determination as to whether a redevelopment project area was predominantly urbanized, *County of Riverside, supra*,

[5]Under section 33320.1, subdivision (b), " 'predominantly urbanized' means that *not less than 80 percent of the land* in the project area: [¶] (1) Has been or is developed for urban uses; or [¶] (2) Is characterized by the condition described in paragraph (4) of subdivision (a) of Section 33031; or [¶] (3) Is an integral part of one or more areas developed for urban uses *which are surrounded or substantially surrounded by parcels which have been or are developed* for urban uses. Parcels separated by only an improved right-of-way shall be deemed adjacent for the purpose of this subdivision." (Italics added.)

65 Cal.App.4th at page 623, found "the meaning of urban is not fixed, objective, or easily ascertainable." *County of Riverside* cited with approval *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1141 [203 Cal.Rptr. 886], which concluded " '[w]hether a residential development is urban or rural therefore, must be determined by evaluating factors relating to the varying characteristics of individual projects.' " (Accord, *County of Riverside, supra*, at p. 622.) Among the many factors considered probative by the *Honey Springs* court included: "density, surrounding development, proximity to or potential of becoming an incorporated area, existing public facilities, water availability in the region, steepness of natural slope, minimum parcel sizes, availability of public transit, ability to cluster housing to preserve open space, height of buildings, on-site sewage capacity, landscaping, lighting, space between structures, proximity of employment centers, preservation of open space easements, size of area to be served by commercial facilities, the attractiveness of commercial facilities to regional travelers, . . . the size of signs. [¶] . . . lot size, length and width of paved streets, amount of traffic generated, presence of commercial or industrial development, presence of urban [infrastructures] (i.e., public water supply, sewer, fire, police, schools, and attendant facilities), and the general impact of the proposed development on . . . scenic, recreational, wildlife or agricultural values[.]" (*Honey Springs Homeowners Assn. v. Board of Supervisors, supra*, 157 Cal.App.3d at pp. 1141-1142; accord, fn. omitted, *County of Riverside, supra*, 65 Cal.App.4th at pp. 622-623.)

b. *Plaintiffs' challenge to sufficiency of evidence of urbanization fails.*

In the instant case, the evidence shows that of the 1,300 acres in the project area, 1,034 acres, or 79.54 percent of the land, are developed with improvements, and 266 acres are undeveloped. Of the 266 acres not developed with improvements, the city's analysis indicates that approximately 191 acres of vacant land are an integral part of an urban area, and that 75 acres are not.

Plaintiffs challenge the finding of urbanization, asserting that 41 percent of the parcels in the project area are unimproved. Be that as it may, the issue is whether 80 percent of the acreage, not 80 percent of the parcels, is urbanized. (§ 33320.1, subd. (b).)

Further, in attacking the finding of urbanization and claiming the 80 percent threshold was unmet, plaintiffs focus on the proposed project area of 1,454 acres, rather than on the revised final acreage of 1,300 acres. Therefore, plaintiffs' argument fails to meet the issue.

We conclude substantial evidence supports the trial court's finding the project area is predominantly urbanized.

### 4. *No support for finding of physical blight under any theory.*

#### a. *Finding of physical blight under section 33031, subdivision (a)(1) lacks evidentiary support; the city has now abandoned this theory.*

Section 33031, subdivision (a)(1), one of the four bases for physical blight, defines that condition as *"Buildings in which it is unsafe or unhealthy for persons to live or work.* These conditions *can be caused by* serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors." (Italics added.)

With respect to physical blight, the city council found: "Approximately 62 percent of the buildings (46 percent of the parcels) in the Project Area are in need of maintenance ranging from deferred maintenance to extensive rehabilitation. 132 buildings (53 percent) are in need of deferred maintenance; 21 buildings (over 8 percent) are in need of moderate rehabilitation, and one building is in need of extensive rehabilitation."

Plaintiffs contend there is no substantial evidence to support this finding. They assert, inter alia, there is no indication that any of the affected parcels contains a building in which it is unsafe or unhealthy for persons to live or work. (§ 33031, subd. (a)(1).) The contention has merit.

Although the city council made a finding that a high percentage of the structures in the project area require varying degrees of rehabilitation, the city's respondent brief makes no attempt to uphold the claim of physical blight under section 33031, subdivision (a)(1). Given the state of this record, the city's abandonment of this theory is not surprising.

Not a single structure was identified by the city as being "unsafe or unhealthy for persons to live or work." (§ 33031, subd. (a)(1).)[6] In assessing the physical conditions in the project area, RSG's criteria included chipped paint, minor nonstructural defects, and broken windows. Out of 250 buildings in the project area, only one structure was identified as being in need of "extensive rehabilitation."

Further, RSG, the consultant which drafted the blight assessment report, acknowledged before the city council: "Diamond Bar does not have the type

---

[6]The closest we have to such a finding is a reference in the Agency's report to the city council that "access to the Vineyard Bank Plaza . . . is limited to" two narrow driveways.

of physical blight that one might think of as the downtown Los Angeles type of blight. But that's not to say that there aren't conditions out there that won't *lead to health and safety considerations.*" However, section 33031, subdivision (a)(1), does not refer to *potential* health and safety concerns but to *existing* unsafe and healthy conditions.

In sum, there is no substantial evidence the project area suffers from physical blight within the meaning of section 33031, subdivision (a)(1).

 b. *Finding of physical blight under section 33031, subdivision (a)(2) also unsupported.*

Under subdivision (a)(2) of section 33031, physical conditions constituting blight are as follows: "Factors that *prevent or substantially hinder the economically viable use* or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors." (Italics added.)

 (1) *The city council's finding.*

In this regard, the city council found: "Approximately 27 percent of all buildings (17 percent of all parcels) in the Project Area exhibit one or more conditions of defective design, including inadequate vehicular access, substandard building materials and inadequate loading areas. Inadequate vehicular access plagues the majority of the smaller retail centers in the Project Area. Typically, these centers provide very limited access points for business patrons. In addition, lack of or inadequate loading areas results in trucks loading and unloading in parking lots, often impeding access to businesses and restricting traffic flow, and resulting in potentially hazardous situations for business patrons. These conditions also limit the potential for private sector development and redevelopment to effectively utilize properties suffering from high vacancies, deterioration and defective design. [¶] 24 percent of the buildings (17 percent of the parcels) in the Project Area have one or more characteristic of substandard design, including obsolescence and outdoor storage and/or production. Commercial retail centers in the Project Area are isolated, with virtually no freeway or major right-of-way visibility and limited access. The obsolete nature of the Project Area's strip retail centers and shopping centers (which are primarily smaller unanchored strip centers constructed in the 1970's and 1980's with little or no improvements or upgrades) has resulted in high vacancies, high turnovers, profitability

problems, and limited shopping opportunities for Diamond Bar residents. These limited opportunities have led to residents purchasing goods and services outside of the City, causing significant retail sales leakage. [¶] Approximately 20 percent of the buildings (16 percent of parcels) in the Project Area do not have parking which is adequate to effectively conduct business and many of the older commercial buildings are built to the property lines. In addition to negatively affecting business operations, the lack of parking interferes with vehicular and pedestrian circulation. Many of the light industrial and commercial uses located in the Project Area also lack sufficient off street parking and, as a result, employees and patrons are forced to park along the streets, and in some cases residential streets, adjacent to these uses. [¶] Geotechnical hazards and problems, such as landslides and critical flood control and drainage deficiencies, have impeded the adequate utilization of the land. Improvements are required to mitigate potential landsliding, flooding and drainage problems, thereby discouraging investment in the properties."

### (2) *Findings must be supported by tangible proof.*

■ In scrutinizing the above findings, we are guided by case law holding that findings of blight must be supported by substantial evidence in the administrative record. In *County of Riverside, supra,* 65 Cal.App.4th at page 627, the appellate court observed: "The rest of the conditions of physical blight are not supported by tangible proof and are not discussed in a meaningful way. An example of the kind of jargon used in the report is the following: 'Functional obsolescence is a condition resulting from changes in modern building practices and the manner in which buildings are utilized. As the building stock ages, its structural components and configurations become unable to meet the expectation and needs of users. This suppresses value and rental income which in turn produces a lower level of physical maintenance at a time when the structures are literally wearing out.' [¶] In other words, buildings age and become less valuable. But the foregoing does not show the existence of blight in the City. The report makes little attempt to describe specific problems caused by older buildings or to estimate the cost of remedying those problems. [¶] Similarly, the report generally discusses economic conditions without quantifying loss of property value. Instead, the report points to low taxable sales without linking those to blighting conditions. Only two hazardous waste sites are identified and the degree of contamination is not described. The bald claim of inadequate parking is also not supported."

Also pertinent here is *Gonzales v. City of Santa Ana, supra,* 12 Cal.App.4th 1335. The issue there was the sufficiency of the evidence to support a

finding that inclusion of certain nonblighted property was necessary to an area's effective redevelopment. (*Id.* at p. 1346.) *Gonzales* stated: "[A]s to nonblighted property substantially removed from Bristol Street itself (i.e., not affected by its physical widening), the city has not articulated *any* concrete reason why that property is 'necessary for the effective redevelopment' of the project area. The city merely cites certain all-purpose conclusory statements from the consultants' report which might apply to any property anywhere. With the exception of a brief reference to the 'proposed street widening,' there is no attempt at any specificity; the reasons appear to have emerged from the consultants' word processor without any thought as to why any particular parcel of nonblighted property must be taken by the government to effectively redevelop nearby blighted property. [Fn. omitted.] While the inclusion of nonblighted property within a redevelopment project may be tested on an abuse of discretion standard [citations], . . . there [must] be *some* specific connection between the inclusion of nonblighted property and the 'effective redevelopment' of an area. We would render the statute a dead letter if we allowed generic, 'canned' reasons having no necessary relationship to any given parcel of nonblighted property to serve that purpose." (*Id.* at pp. 1346-1347.)

(3) *Finding of physical blight under subdivision (a)(2) of section 33031 is unsupported.*

██ Although the city found, pursuant to section 33031, subdivision (a)(2), that 27 percent of all buildings in the project area exhibit one or more conditions of defective design, including inadequate vehicular access, substandard building materials and inadequate loading areas, the city did not identify a single building as suffering from such conditions. Similarly, although the city found the retail centers were plagued by inadequate vehicular access, it did not indicate which locations suffer from inadequate vehicular access or lack of adequate loading areas.[7] Likewise, the city has not specified the basis of its finding that 24 percent of the buildings in the project area have one or more characteristics of substandard design, including obsolescence and outdoor storage and/or production. Moreover, there is no specification as to how such conditions have hindered the economically viable use of these unidentified properties within the meaning of section 33031, subdivision (a)(2), as claimed by the city. We are given only generic reasons "which might apply to any property anywhere." (*Gonzales v. City of Santa Ana, supra*, 12 Cal.App.4th at p. 1346.)

---

[7]We note, however, the Agency reported to the council that in a survey of residents and shoppers, only 6 percent of respondents felt that the city needed to improve traffic control to improve retail business in Diamond Bar.

The record reflects the ordinance adopted by the city council essentially reiterated the conclusions set forth in the Agency's report to the council. However, the Agency's report likewise was bereft of any discussion of specific defects in specific properties. Instead, the Agency's report repeatedly referred in general terms to the results of RSG's field survey of the project area. The field survey data consisted of a list of the parcels in the project area, in a grid format, with boxes to be checked off for categories such as chipped or peeling paint, defective design, incompatible use, substandard design and inadequate parking. The field survey was performed from the sidewalk or public rights-of-way, with the surveyor's conclusions reduced to a series of boxes checked off on a grid. Thus, at the end of the day, the raw data in the administrative record consists of a series of checkmarks reflecting the field surveyor's ultimate conclusions. The field surveyor's bald conclusions do not amount to tangible proof which can be scrutinized in a meaningful way. (*County of Riverside, supra,* 65 Cal.App.4th at p. 627.)

We further note there is no explanation of the basis for the city's finding that "[c]ommercial retail centers in the Project Area are isolated, with virtually no freeway or major right-or-way visibility and limited access." Moreover, this finding flies in the face of the 1995 general plan, which states: "There are also several large shopping centers in the City with good freeway visibility and access, which can support regional, freeway-serving or community commercial uses."

We are aware the city asserts redevelopment is necessary because its commercial area, dating back to the 1970's and 1980's, has become obsolete due to a shift in consumer preferences to "power centers" housing "big box" stores or discount retailers such as Target, Ikea, Costco and Home Depot. However, the Agency has emphasized "it is neither the intent nor desire of the Agency to establish the proposed redevelopment project for the primary purpose of facilitating the attraction of large-scale, discount oriented retail development." Instead, the Agency seeks to provide for the rehabilitation and improvement of existing development within the city.

Thus, although the city attributes the decline in its commercial area to buildings and lots which are of "inadequate size given present standards and market conditions" (§ 33031, subd. (a)(2)), there is no contemplation of creating power centers in the project area to remedy this purported source of blight. Thus, there is a total "disconnect" between the cause of the alleged blight and the proposed remediation.

Further, there is no specification as to the 20 percent of buildings that lack adequate parking, nor any showing to quantify how inadequate parking has hindered the economically viable use of those properties.[8]

In sum, after scrutinizing the city council's findings and the Agency's report to council, we reach the same conclusion as the court in *County of Riverside*. "[A]fter sifting through the general commentary that comprises much of the redevelopment report, we discover there is little substantive material to be gleaned. *Although the report speaks in the statutory language used to define blight*, the report offers little concrete evidence of actual conditions of blight." (*County of Riverside, supra*, 65 Cal.App.4th at pp. 626-627, italics added.) The asserted conditions of physical blight are set forth in conclusionary and summary terms. The purported physical blight is discussed only in generalities, without any showing of the extent to which the alleged blighting conditions have prevented or substantially hindered the economically viable use of the properties. (§ 33031, subd. (a)(2).)

We conclude the finding of blight pursuant to section 33031, subdivision (a)(2) is not supported by substantial evidence.[9]

c. *Finding of physical blight under subdivision (a)(3) of 33031 fails; no finding the incompatible uses hindered economic development.*

Under subdivision (a)(3) of section 33031, physical blight may stem from "[a]djacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area." (§ 33031, subd. (a)(3).)

In this regard, the city council found that of the 322 parcels in the project area, "12 parcels [or 3.7 percent] are incompatible to adjoining or nearby uses. For instance, industrial uses surrounding Walnut Elementary School have resulted in a number of problems such as traffic and noise. The large volume of industrial traffic poses significant safety threats to school children traveling to and from school."

This finding is not cognizable under section 33031, subdivision (a)(3). In order to meet the requirements of said subdivision, the incompatible use

---

[8]In this regard, the only specification in the Agency's report to the city council consists of the following: one residential street near a commercial office structure was lined with cars; and a certain industrial park had only four parking spaces for each tenant space.

[9]Finally, with respect to the city council's finding that geotechnical hazards such as landslides and critical flood control and drainage deficiencies had impeded the adequate utilization of the land in the project area, the city makes no attempt to defend that finding on appeal. The city's abandonment of that ground is not surprising, given the determination in the final environmental impact report that the proposed redevelopment did not pose any potential for significant geologic problems.

must "prevent the economic development of those parcels or other portions of the project area." (§ 33031, subd. (a)(3).) Instead, the city's finding focused on the traffic, noise and safety concerns related to the proximity of the school to the industrial properties.

Because the city failed to find the incompatible uses hindered economic development so as to constitute physical blight within the meaning of section 33031, subdivision (a)(3), we do not reach the issue of the sufficiency of the evidence to support such a finding.

Thus, the city's reliance on section 33031, subdivision (a)(3) is unavailing.[10]

d. *Finding of physical blight under section 33031, subdivision (a)(4) also infirm; no substantial evidence that parcels of irregular shapes and inadequate sizes in multiple ownership have hindered usefulness and development.*

Under subdivision (a)(4) of section 33031, physical blight may stem from "[t]he existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership."

In this regard, the city council found: "48 parcels (15 percent) located throughout the Project Area are irregularly formed and shaped and under multiple ownership. These parcels are a barrier to development because they are frequently difficult or impossible to use without combining with other parcels. 10 of the 15 retail shopping centers (66 percent) are in multiple ownership. Because of diversity of ownership, as well as small lots sizes, it is unlikely that the reuse or private redevelopment of deteriorated and obsolete properties will be possible without a land assembly effort."

In *County of Riverside, supra*, 65 Cal.App.4th at page 626, the appellate court stated, "[t]he report also generally identified problems with the traffic circulation system, flooding, *and irregular plot sizes*, particularly that created by the construction of the Interstate 15 and Interstate 215 junction." (Italics added.) The appellate court upheld the trial court's determination that "the evidence of physical blight was either slight or not supported by specific evidence. Additionally, the economic evidence of blight was not quantified

[10]Even assuming the incompatible uses have led to vacancies in the industrial area, redevelopment will not alleviate this condition unless the Agency intends to acquire the school. However, the Agency did not include such an acquisition in its implementation plan submitted to the city council pursuant to section 33352, subdivision (c).

and not shown to constitute a serious physical or economic burden on the community." (*Ibid.*)

The finding herein under section 33031, subdivision (a)(4), is similarly infirm. The mere fact of multiple ownership does not establish blight. Otherwise, a condominium development by definition would be blighted. Further, there is no showing that the size and shape of any of these parcels renders them inadequate for "proper usefulness and development." (§ 33031, subd. (a)(4).) The Agency's assertion in its report to council that "small lot sizes, coupled with the diversity of ownership," made private redevelopment difficult or impossible is unsupported.

In addition, although the city contends its commercial areas have been rendered obsolete by the shift toward large scale power centers and big box type retailers, as noted, the city has eschewed that type of development. Further, even assuming economic development requires the availability of large tracts of land, the redevelopment area contains a number of undeveloped parcels as large as 47, 41, 36, 35 and 24 acres.

For these reasons, there is no substantial evidence to support the city council's finding of physical blight pursuant to section 33031, subdivision (a)(4).

*5. No basis for declaration of blight under any of the alternatives contained in section 33030.*

*a. Due to absence of physical blight, section 33030, subdivision (b)(2)(A) is unavailing to the city.*

Under section 33030, subdivision (b)(2)(A), a area is blighted if it is "characterized by . . . the following: [¶] (A) *One or more* conditions set forth in any paragraph of subdivision (a) of Section 33031 [physical blight] and *one or more* conditions set forth in any paragraph of subdivision (b) of Section 33031 [economic blight]." (Italics added.)

As discussed above, none of the four conditions of physical blight under section 33031 is present. Therefore, there is no blight within the meaning of subdivision (b)(2)(A) of section 33030, without even addressing any issues of economic blight.

*b. Subdivision (b)(2)(B) of section 33030 likewise is inapplicable.*

Alternatively, under subdivision (b)(2)(B) of section 33030, an area may be deemed blighted if it is characterized by "(B) The condition described in

paragraph (4) of subdivision (a) of Section 33031." Section 33031, subdivision (a)(4), includes as a form of physical blight the "existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." Thus, physical blight pursuant to section 33031, subdivision (a)(4) is sufficient, without economic blight, to support a declaration of blight pursuant to section 33030, subdivision (b)(2)(B).

However, as discussed above, there is no substantial evidence of physical blight within the meaning of section 33031, subdivision (a)(4). Therefore, the alternative of section 33030, subdivision (b)(2)(B) is unavailing to the city.

 c. *No substantial evidence of inadequate infrastructure precludes city from invoking section 33030, subdivision (c).*

Finally, pursuant to section 33030, subdivision (c), "[a] blighted area also may be one that contains the conditions described in subdivision (b) and is, in addition, characterized by the existence of inadequate public improvements, parking facilities, or utilities."

In this regard, the city found: "The Project Area is characterized by inadequate public infrastructure, improvements and facilities, which contributes to the stagnation of the area's development and limits the use and reuse of existing commercial and industrial structures. Existing landscaping, streetscaping, and public facilities are in need of upgrading or expanding to provide a pedestrian-friendly environment that encourages business patronage and private sector investment."

Here again, we are presented purely with generalities as to why the infrastructure is deficient. There is nothing, for example, to indicate "that the lack of such improvements has unduly burdened the existing . . . use of the area." (*Emmington v. Solano County Redevelopment Agency* (1987) 195 Cal.App.3d 491, 500 [237 Cal.Rptr. 636].)

Further, the city's assertion of blight due to inadequate infrastructure flies in the face of its 1995 general plan, which reported: "At present, the City has a fairly new infrastructure system." The general plan went on to acknowledge "[t]here is a need to plan now for the anticipated increase in traffic, the maintenance of existing facilities, fund new facilities, and

support future services to enhance the quality of life in Diamond Bar." However, the purpose of the CRL is to alleviate existing blight, not to help a municipality deal with future growth. The assertion of blight based on inadequate infrastructure cannot stand.

### 6. *Remaining issues not reached.*

In view of the above, it is unnecessary to review the city's finding that the "blight" cannot be reversed or alleviated by private enterprise alone without redevelopment (§ 33030, subd. (b)(1)), or any other issues.

### CONCLUSION

To invoke "the extraordinary powers of community redevelopment" (*Regus v. City of Baldwin Park, supra,* 70 Cal.App.3d at p. 979), it is not sufficient to issue a report and to adopt an ordinance speaking in the statutory language. (*County of Riverside, supra,* 65 Cal.App.4th at p. 627.) The purpose of the CRL is to provide a means of remedying blight where it exists. The CRL is not simply a vehicle for cash-strapped municipalities to finance community improvements. If the showing made in the case were sufficient to rise to the level of blight, it is the rare locality in California that is not afflicted with that condition.[11]

We conclude there is no substantial evidence to support the city's finding of blight within the meaning of the statutory definition. Therefore, the decision of the trial court must be reversed.

### DISPOSITION

The judgment is reversed with directions to enter judgment invalidating the redevelopment plan.

---

[11]We recognize the statutory definition of blight has evolved over the years. However, as stated just two years ago in *County of Riverside, supra,* 65 Cal.App.4th at pages 627-628, "[T]rue blight is expressed by the kind of dire inner-city slum conditions described in the *Bunker Hill* case: unacceptable living conditions of 82 percent; unacceptable building conditions of 76 percent; crime rate of double the city's average; arrest rate of eight times the city's average; fire rate of nine times the city's average; and the cost of city services more than seven times the cost of tax revenues. (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 45.) [¶] Another case in which blight was exemplified is *Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243 [284 Cal.Rptr. 745]. Blighted conditions in *Morgan* included: unacceptable building conditions of 63 percent, including 25 percent seismically unsafe commercial buildings; overcrowded housing; incompatible adjacent adult-entertainment and industrial uses; no recreational uses; transient rentals; high crime rate; large homeless and runaway population; depreciating property values; and no likelihood of private development and investment."

Plaintiffs to recover costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied May 17, 2000, and respondents' petition for review by the Supreme Court was denied August 9, 2000. Kennard, J., was of the opinion that the petition should be granted.