DECISION
{¶ 1} Defendants-appellants, Clif Cor Company, Richard C. Bucher, Rosemary Bucher, J. Vincent Aug, Louise Aug, H. Alton Fessel, Karen Fessel, and Mildred Davis (collectively, "Clif Cor"), appeal the judgment of the Hamilton County Court of Common Pleas permitting the appropriation of real property and setting the value of the property in an eminent-domain action filed by plaintiff-appellee, the city of Cincinnati ("the city").
 Clif Cor's Property and the Urban-Renewal Plan {¶ 2} In the 1960s, Clif Cor bought two parcels of real estate in the Clifton Heights neighborhood near the campus of the University of Cincinnati. It constructed two fast-food restaurants on the parcels.
 {¶ 3} In the late 1990s, members of the Clifton Heights community and representatives of the university began investigating ways to improve Clifton Heights. This "steering committee" led to the formation of the nonprofit Clifton Heights Community Urban Redevelopment Corporation ("CHCURC").
 {¶ 4} In conjunction with the efforts of CHCURC to improve the area, the city completed a blight study of the neighborhood under Cincinnati Municipal Code Chapter 725. After city architect Jeffrey Stine determined that the area was blighted, CHCURC submitted an urban-renewal plan to city council. In the plan, CHCURC stated as its goal the elimination of blight through the construction of new retail, residential, and parking facilities.
 {¶ 5} The goal was to be accomplished by the city's purchase of certain properties and, if necessary, by the city's use of its eminent-domain authority. Under the plan, the city was to purchase the properties and then convey them to CHCURC for redevelopment. CHCURC was to reimburse the city for the cost of the properties and for the expenses of obtaining them.
 {¶ 6} City council approved the urban-renewal plan that CHCURC had drafted, and the city then began its efforts to acquire the properties.
 {¶ 7} Because the city and Clif Cor could not agree on terms for the sale of Clif Cor's properties, the city filed a complaint for appropriation in 2003.
 {¶ 8} After a bench trial in 2004, the trial court held that the appropriation of the properties was proper under Cincinnati Municipal Code 725-1-B, because the district defined in the urban-redevelopment plan was "blighted" within the meaning of the ordinance.
 {¶ 9} Following a trial on the issue of compensation for the properties, the court entered judgment in accordance with the jury's determination that the combined fair-market value of the properties was $1,590,000.
 Clif Cor's Constitutional Challenge {¶ 10} In the first of seven assignments of error, Clif Cor argues that the appropriation of the property was improper because Cincinnati Municipal Code 725-1-B is unconstitutionally vague.
 {¶ 11} In Norwood v. Horney,[1] the Supreme Court of Ohio held that the void-for-vagueness doctrine applies to eminent-domain laws. When a legislative action is challenged as unconstitutionally vague, a court must determine whether the enactment (1) provides sufficient notice of its proscriptions to permit compliance by a person of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement.[2]
 {¶ 12} Because the right to possess and preserve property is fundamental, courts must apply "the heightened standard of review employed for a statute or regulation that implicates a First Amendment or other fundamental constitutional right."[3]
 The Norwood Ordinance {¶ 13} The Norwood court struck down the eminent-domain ordinance because it permitted appropriation solely on the basis that the neighborhood surrounding the property in question was a "deteriorating area."[4]
 {¶ 14} The Norwood ordinance provided a large array of conditions in an attempt to define "deteriorating neighborhood." Those conditions included incompatible land uses, nonconforming uses, lack of adequate parking, faulty street arrangement, obsolete platting, and diversity of ownership.[5] Other factors the trial court had used in classifying the neighborhood as "deteriorating" included increased traffic, dead-end streets, numerous curb cuts, and small front yards.[6]
 {¶ 15} The Norwood court emphasized that the term "deteriorating" as defined in the ordinance and as applied by the trial court did not require a showing of conditions that were generally associated with the terms "`slum or blighted or deteriorated area,' the standard typically employed for a taking."[7] The court observed that the "buildings in the neighborhood were generally in good condition and the owners were not delinquent in paying property taxes. There [was] no suggestion that the area was vermin-infested or subject to high crime rates or outbreaks of disease, or otherwise posed an impermissible risk to the larger community."[8]
 {¶ 16} On the contrary, the court emphasized that "all of those factors [in the Norwood ordinance] exist in virtually every urban American neighborhood. Because the Norwood Code's definition of a deteriorating area describes almost any city, it is suspect."[9]
 {¶ 17} In holding the ordinance to be impermissibly vague, the court stated that "`deteriorating area' is a standardless standard. Rather than affording fair notice to the property owner, the Norwood Code merely recite[d] a host of subjective factors that invite[d] ad hoc and selective enforcement * * *."[10]
 {¶ 18} The Norwood court further held that the ordinance was unconstitutionally vague because, in allowing the government to appropriate property when an area was merely in danger of deteriorating, it permitted speculation about what the area might become in the future.[11] The court held that "[s]uch a speculative standard is inappropriate in the context of eminent domain, even under the modern, broad interpretation of `public use.'"[12]
 Cincinnati Municipal Code 725-1-B {¶ 19} In defining the term "blighted," Cincinnati Municipal Code 725-1-B contains factors that are substantially identical to those listed to define the term "deteriorating neighborhood" in the Norwood ordinance.
 {¶ 20} The ordinance defines "blighted area" as an area in which both the structures and the vacant parcels meet a number of criteria.
 {¶ 21} Structures in a particular area give rise to a finding of blight if at least 50 percent of the total number of structures distributed throughout the area meet three of a number of listed criteria to any degree or any one or two of the criteria "to an excessive degree." Those listed criteria include the following: age in excess of 40 years; obsolescence; dilapidation or deterioration; abandonment or vacancy exceeding 33 percent; faulty arrangement or lot layout, including lack of required off-street parking or loading space; inadequate or deteriorated public facilities or rights-of-way or defective layout of streets; diversity of ownership rendering private assemblage for redevelopment unlikely; and other factors inhibiting private development or otherwise detrimental to the public health or welfare.
 {¶ 22} Vacant parcels are considered blighted if they meet two of a number of listed criteria to any degree or any one of the criteria "to an excessive degree." Those criteria include the following: diversity of ownership; faulty arrangement or lot layout; inadequate or deteriorated public facilities or rights-of-way or defective layout of streets; and other factors inhibiting development or detrimental to the general public health or welfare.
 {¶ 23} In addition to the findings for structures and vacant parcels, a determination that an area is blighted requires that "at least 25 percent of the structures, reasonably distributed throughout the area, are deteriorated or deteriorating; or the public improvements are in a general state of deterioration."
 Cincinnati Municipal Code 725-1-B and the Norwood Holding {¶ 24} In attempting to distinguish this case from Norwood, the city notes that Cincinnati Municipal Code 725-1-B requires a finding that the structures or parcels in the area exhibit "deterioration" or that they are "deteriorated," instead of a finding that they are merely "deteriorating."
 {¶ 25} The city also notes that deterioration is only one of a large number of conditions that can support a finding of blight. The city emphasizes that, unlike the right provided by the ordinance inNorwood, the right to take property in this case was not based solely on the area being classified as "deteriorating."
 {¶ 26} As a result of these distinctions, the city maintains that Cincinnati Municipal Code 725-1-B does not run afoul of the vagueness doctrine as defined in Norwood. This argument is not persuasive.
 {¶ 27} First, according to architect Stine's definition of deterioration as used in his study, a structure begins to deteriorate as soon as it is built, because natural elements and other factors immediately begin to cause the structure to decrease in quality or to "become worse." Based on this definition, Stine came to the conclusion that 100 percent of the structures in the study area exhibited deterioration or were deteriorated.
 {¶ 28} The definition of deterioration in the blight report was therefore no standard at all. Under the definition used in Stine's report, there would be no way to prevent or eliminate deterioration once construction is complete. If anything, Stine's use of the words "deterioration" or "deteriorated" gave even less notice to property owners than did the term "deteriorating" in the Norwood ordinance, and it invited the same degree of ad hoc and selective enforcement.
 {¶ 29} And the vagueness of the terms "deterioration" and "deteriorated" was significant because the trial court based its decision to a great extent on the portion of the Stine study describing the deterioration of the area. The court apparently recognized that the terms were not amenable to clear definition, but it stated that "the degree to which deterioration is to be considered a blighting factor is one to be determined in the first instance by the legislative authority."
 {¶ 30} Under the heightened standard of review required by the holding of the Norwood court, though, such a degree of deference was not warranted. Accordingly, we reject the city's argument that its use of the terms "deterioration" and "deteriorated," rather than "deteriorating," constituted an appreciable distinction.
 {¶ 31} Second, we find little significance in the fact that "deterioration" was but one of a number of factors to be considered in determining blight. The remaining factors listed in the ordinance — and particularly those that the trial court found applicable — were of the same questionable utility as those held invalid in theNorwood decision.
 {¶ 32} Here, the trial court found that diversity of ownership rendered private assemblage for redevelopment unlikely, that there was faulty arrangement or lot layout and defective layout of streets, and that virtually all the structures in the study area were over 40 years old.
 {¶ 33} As was the case in Norwood, the factors demonstrated in the case at bar did not establish blight. Diversity of ownership was a factor that the Norwood court specifically condemned, stating that the term was "susceptible of many meanings and to manipulation,"[13] and that it did not provide a compelling argument that an area was deteriorated.[14]
 {¶ 34} Similarly, the Norwood court noted that faulty street arrangement and lot layout would be present in "almost any city" and was therefore "suspect" in defining deterioration or blight.[15] And as the trial court itself noted in its decision in this case, much of the construction in Cincinnati was over 40 years old, rendering age another suspect factor in determining blight.
 {¶ 35} In sum, the factors found to be blighting influences in this case simply did not establish that the area was blighted or deteriorated. They merely indicated that the area possessed characteristics that would likely be endemic in any urban setting. The structures in the neighborhood were generally in good repair, and, as inNorwood, there was no suggestion that the property owners were delinquent in paying taxes, that the area was vermin-infested or crime-ridden, or that it otherwise posed an impermissible risk to the larger community.[16]
 {¶ 36} Accordingly, we hold that Cincinnati Municipal Code 725-1-B is unconstitutionally vague. The trial court erred in holding that the area surrounding Clif Cor's property was blighted and in permitting the appropriation of Clif Cor's properties. We sustain the first assignment of error.
 {¶ 37} In the remaining six assignments of error, Clif Cor alleges other defects in the appropriation and valuation of the properties. But because our resolution of the first assignment of error is dispositive of the appeal, the remaining assignments are moot, and we need not address them on their merits.
 Conclusion {¶ 38} The ordinance upon which the trial court based its order of appropriation is unconstitutional, and the city was therefore not entitled to acquire Clif Cor's properties by eminent domain. Accordingly, we reverse the judgment of the trial court and enter judgment in favor of Clif Cor on the city's complaint for appropriation.
Judgment accordingly.
SUNDERMANN and WlNKLER, JJ., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, at ¶ 88.
[2] Id. at ¶ 84, citing Kolenderv. Lawson (1983), 461 U.S. 352, 357,103 S.Ct. 1855.
[3] Id. at 88, citing Hoffman Estates v. The Flipside, HoffmanEstates, Inc. (1982), 455 U.S. 489, 498-499, 102 S.Ct. 1186.
[4] Id at ¶ 90.
[5] Id. at ¶ 93.
[6] Id.
[7] Id at ¶ 92.
[8] Id.
[9] Id. at ¶ 93, citing Beach-Courchesne v. Diamond Bar (2000), 80Cal.App.4th 388, 407, 95 Cal.Rptr.2d 265, ma Birmingham v. Tutwiler DrugCo. (Ala. 1985), 475 So.2d 458, 466.
[10] Id. at ¶ 98.
[11] Id. at ¶ 99.
[12] Id.
[13] Id. at ¶ 94.
[14] Id. at ¶ 96.
[15] Id. at ¶ 93.
[16] See id. at ¶ 92.