[No. A031523. First Dist., Div. Five. June 8, 1987.]

MARGARET EMMINGTON, Plaintiff and Appellant, v.
SOLANO COUNTY REDEVELOPMENT AGENCY et al.,
Defendants and Respondents.

492

COUNSEL

E. Clement Shute, Jr., Fran M. Layton, Elizabeth M. Dodd, Laurie E. Kermish and Shute, Mihaly & Weinberger for Plaintiff and Appellant.

Tina A. Thomas, James G. Moose, Remy & Thomas, Thomas F. Olson and Carolyn I. Richardson as Amici Curiae on behalf of Plaintiff and Appellant.

Charles O. Lamoree, County Counsel, R. Bruce Tepper, Jr., and Weiser, Kane, Ballmer & Berkman for Defendants and Respondents.

David Monthie and Gregory Plaskett as Amici Curiae on behalf of Defendants and Respondents.

OPINION

HANING, J.—Appellant Margaret Emmington appeals a judgment validating the Collinsville-Montezuma Hills Redevelopment Project (redevelopment plan) involving approximately 10,350 acres of land in Solano County primarily devoted to agricultural use.[1] The redevelopment plan proposes

---

[1] Appellant owns property within the redevelopment area. She is joined in this appeal by amici curiae Farmers and Residents of Montezuma Hills and California Farm Bureau Federation. Future reference to appellant's arguments include those of amici.

the development of water-dependent industrial uses in the project area, including the possible construction of an industrial road, a rail line, shipping berths and water-oriented commercial recreation facilities. Appellant contends the redevelopment plan was approved by respondents Solano County Redevelopment Agency and the Solano County Board of Supervisors in violation of the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) and the California Environmental Quality Act. (Pub. Resources Code, § 21000 et seq.)[2] We reverse, having concluded the record before us does not contain substantial evidence demonstrating the project area is blighted within the meaning of the Community Redevelopment Law.

The setting for the redevelopment plan is a 10,350-acre site in the unincorporated Montezuma Hills area of Solano County. The project area is bounded generally on the west by the Suisun Marsh Protection Area, on the north by Talbert Lane, and on the south and east by the Sacramento River. Within the project area, most of the land is held by five large owners. Southern Pacific Railway owns 2,800 acres, Pacific Gas and Electric Co. owns 1,000 acres, Dow Chemical owns 2,800 acres, Wells Fargo holds 500 acres in trust, and Dozier and Pressley Company owns 2,000 acres. These owners lease most of the land for dry farming,[3] with farms averaging 800 acres in size.

The project area also includes the Towns of Collinsville and Birds Landing. Collinsville consists of approximately 27 acres and is located along the Sacramento River. It was once a small fishing community, but is now a single-family residential area with a number of vacant lots. Birds Landing consists of roughly eight acres and includes both single-family homes and several neighborhood commercial operations. With the exception of Collinsville and Birds Landing, there is very little development in the project area.

The project area is distinguished not so much by its condition as by its location. Being near the Sacramento River, it is an ideal location for commercial development—a fact which has not gone unnoticed. The land within the redevelopment project area was described by planning consultants "as one of the last Bay region opportunities for the development of large-scale, water-oriented industry ...." Four years before the area was slated for redevelopment, it was targeted for development. In August 1979 the Solano County Board of Supervisors adopted the Collinsville-Montezuma

---

[2] Respondents are joined in this appeal by amici curiae Solano County Legal Assistance and Napa-Solano Builder's Exchange. Future reference to respondents' arguments include those of amici.

[3] Dry farming is a rotational process of grain growing and grazing which requires little or no irrigation or fertilization.

Hills Area Plan and Program (area plan). The area plan addressed land uses for roughly 50,000 acres in southeastern Solano County. Prior to the adoption of the area plan, the 10,350-acre site which would eventually become the redevelopment project area was designated primarily for agricultural use. After adoption of the area plan, land use designations in the project area were changed to include water-dependent industrial and commercial recreational uses.

However, the expected development of the area by private industry failed to materialize. In 1983 respondents began to consider the Community Redevelopment Law as a means of stimulating development. On July 19, 1983, the Solano County Board of Supervisors passed a resolution declaring the project area[4] needed study "to determine if a redevelopment project or projects within the area are feasible." At this point there were severe time constraints imposed on the procedural steps necessary to adopt a redevelopment plan for the project area. Health and Safety Code section 33320.1 had been amended effective January 1, 1984, to limit the use of the redevelopment process to areas that were "predominantly urbanized."[5] Thus, after 1983 (which was then less than six months away) the project area could not be subject to a redevelopment plan because it did not meet the statutory requirements.

A redevelopment plan was submitted to the board of supervisors describing the condition of the project area as "blighted." This conclusion was based primarily on the "lack of adequate public improvements, public facilities and utilities to serve existing and planned development," and the fact that many properties in the project area were subject to flooding. The proposed redevelopment projects included an industrial road (estimated cost $10.64 million), rail line reconstruction (estimated cost $11.9 million), and construction of a deep draft shipping berth (estimated cost $8.16 million). The plan further authorized the redevelopment agency to install and construct public improvements, public facilities and public utilities needed for plan implementation. The plan provided that the redevelopment agency could acquire real property located in the project area through the power of eminent domain. (See Health & Saf. Code, § 33037.)

Like most redevelopment plans, the primary source of revenue to repay project costs would be from tax increment financing. Through the use of tax

---

[4]The project area consisted of the 10,350 acres previously rezoned pursuant to the area plan for water-dependent industrial uses.

[5]Health and Safety Code section 33320.1 had been amended effective January 1, 1984, to define a "project area" as a "predominantly urbanized area of a community which is a blighted area ... [meaning] that not less than 80 percent of the privately owned property in the project area has been or is developed for urban uses."

increment financing, the assessed value of the property is frozen as shown on the last assessment roll at the time the redevelopment plan is adopted. Future increases in property taxes caused by improvements built on the project site are paid to the redevelopment agency to pay the principal and interest on any indebtedness incurred by the redevelopment agency to finance the project. The plan authorized the redevelopment agency to finance the proposed projects with financial assistance from county, state and federal governments; property tax increments; interest income; redevelopment bonds; loans; or any other source.[6] It called for over $100 million in projects, to be completed over a 50-year period. The plan concluded "[t]he California redevelopment process is necessary to remove the blighting factors which are hindering the full economic utilization of the land." After holding public hearings,[7] the board of supervisors approved the redevelopment plan on December 13, 1983.

The environmental effects of the project components were addressed in a five-page initial study. The initial study concluded that 19 existing environmental impact reports and planning documents prepared over the course of 8 years adequately identified the environmental impacts of the redevelopment plan and ways to mitigate their significant effects for purposes of compliance with the California Environmental Quality Act. On December 6, 1983, the board of supervisors made findings with respect to the significant environmental impacts of the redevelopment project, the feasible mitigation measures, and the overriding considerations it felt justified proceeding with the project.

On January 13, 1984, appellant filed the instant action, primarily alleging the project area was not a proper area for redevelopment and that the environmental review process was inadequate. After the trial court denied relief, appellant noticed this appeal.

---

[6] The redevelopment process has not been without its critics. The court in *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968 [139 Cal.Rptr. 196], described the process as follows: "Such schemes contemplate borrowing money by issuing bonds on the strength of assured future tax revenues, money which is then used to acquire, improve, and resell property within the project area at a loss as an inducement to business enterprises . . . to locate within the project area rather than in neighboring communities. In essence, tax revenues are used as subsidies to attract new business. The immediate gainers are the subsidized businesses. The immediate losers are the taxpayers and government entities outside the project area, who are required to pay the normal running expenses of government operation without the assistance of new tax revenues from the project area." (*Id.*, at p. 982; see also Molho & Kanner, *Urban Renewal: Laissez-Faire for the Poor, Welfare for the Rich* (1977) 8 Pacific L.J. 627, 634.)

[7] It appears the decision to redevelop this project area had, in large part, already been made when public comment was solicited. Property owners were sent a letter inviting them to a public meeting on the proposed redevelopment plan where they would "have an opportunity to propose projects which . . . should be funded through redevelopment." At this point, no redevelopment plan had been approved; and comments would have more properly been directed to the feasibility of redevelopment in the project area.

■ Before a project area can properly be selected for redevelopment under the Community Redevelopment Law, it must be blighted. In fact, the blighted condition of the area is the very basis of the redevelopment agency's jurisdiction to acquire the property by eminent domain and expend public funds for its redevelopment. (See *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270, 277 [133 Cal.Rptr. 859, 555 P.2d 1099]; *County of Santa Cruz* v. *City of Watsonville* (1985) 177 Cal.App.3d 831, 839 [223 Cal.Rptr. 272].) The term "blight" has never been defined with precision, nor can it be. However, the Legislature and courts have provided some guidelines. ■ A two-part test is required to substantiate a finding of blight: First, the area must constitute a *"serious physical, social, or economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise acting alone."* Secondly, one of the characteristics of blight as set out in Health and Safety Code sections 33031 or 33032 must exist.[8] (Health & Saf. Code, § 33030, italics added.)

To qualify as a proper subject of redevelopment, a project area must "be blighted when considered as a whole." (*Regus* v. *City of Baldwin Park, supra,* 70 Cal.App.3d at p. 981.) Conditions of blight must "predominate" and must "injuriously affect the entire area." (Health & Saf. Code, § 33321; *Regus* v. *City of Baldwin Park, supra,* at p. 981.) Only a "compelling economic need" (*Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 793 [266 P.2d 105]) can justify using the "extraordinary power" of redevelopment. (*Regus* v. *City of Baldwin Park, supra,* at p. 979.) An agency's "expectation of economic improvement and the prospect of speculative gain" furnish an insufficient basis for the use of the powers of redevelopment. (*Regus* v. *City of Baldwin Park, supra,* at p. 980.)

■ As we are reminded repeatedly by respondents, we must uphold the finding of blight if supported by substantial evidence. (See *In re*

---

[8] Health and Safety Code section 33031 states: "A blighted area is characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors: [¶] (a) Defective design and character of physical construction. [¶] (b) Faulty interior arrangement and exterior spacing. [¶] (c) High density of population and overcrowding. [¶] (d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities. [¶] (e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses."

At the time the redevelopment plan was approved Health and Safety Code section 33032 read: "A blighted area is characterized by: (a) An economic dislocation, deterioration, or disuse, resulting from faulty planning. [¶] (b) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development. [¶] (c) The laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions. [¶] (d) The existence of inadequate streets, open spaces, and utilities. [¶] (e) The existence of lots or other areas which are subject to being submerged by water."

*Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 39 [37 Cal.Rptr. 74, 389 P.2d 538].) However, the Supreme Court's unanimous decision in *Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d 270, demonstrates that a finding of blight is not conclusive. The Community Redevelopment Law has established factors to be considered in determining whether an area is blighted, and it is the court's role to ensure those factors are taken into account. In short, the courts are required to be more than rubber stamps for local governments.

In *Sweetwater* the Supreme Court reversed the decision of a city and its redevelopment agency declaring a 130-acre golf course to be a blighted area and approving a redevelopment plan to put a 70-building shopping center in its place. The golf course was subject to flooding, and the driving range had been closed for repairs for as long as three weeks due to flood damage. The value of the land was depressed compared to other parts of the city, and the property was encumbered by numerous public and private easements, making private development "infeasible." (*Id.,* at p. 279.) Nevertheless, the Supreme Court pointed out that the golf course remained "marginally profitable" and furthered the Legislature's policy toward preservation of open-space land. The court concluded the golf course was not blighted because the alleged blighting factors had "not ended its present economic use"; and therefore the area did not meet the criteria for redevelopment. (*Ibid.*)

After reviewing the legislative scheme of the Community Redevelopment Law, the *Sweetwater* court made several pertinent findings. First, and most importantly, it stressed that "the Legislature made clear its intent that a determination of blight be made—not on the basis of potential alternative use of the proposed area—but on the basis of the area's *existing use*." (*Id.,* at p. 278, italics added.) Second, the mere fact that a project area exhibits a blighted condition, such as flooding, does not automatically bring it within the terms of the redevelopment statute. The project area must constitute a serious economic or social liability. (*Id.,* at p. 279.) Third, the court stressed that the redevelopment statute should not be used " 'just because the public agency considers that it can make a better use or planning of an area than its present use or plan.' " (*Id.,* at p. 278.)

The determination of blight in the instant case was framed in statutory language. The board of supervisors found the project area was characterized by "properties which suffer from economic dislocation and disuse" because of the existence of (1) lots which are subject to severe flooding;[9] and (2)

---

[9] The Legislature amended Health and Safety Code section 33032 effective January 1, 1984, to delete flooding as a characteristic of blighted land.

inadequate public improvements, public facilities, open spaces and utilities. (Former Health & Saf. Code, § 33032.) The board found the "elimination of blight and the redevelopment of the Project Area cannot be reasonably expected to be accomplished by private enterprise acting alone ...." (Health & Saf. Code, § 33032.) Furthermore, the board concluded the project area contained "physical, social and economic liabilities requiring redevelopment in the interest of the health, safety, and general welfare of the people of Solano County." (Health & Saf. Code, §§ 33032, 33035.)

These findings were based in large part on the redevelopment agency's report to the board of supervisors concerning blight in the project area. That report stated "[a]ll parcels in the Project Area were determined to be blighted due to the lack of public improvements, facilities and utilities *needed to carry out provisions of the [area plan]*." Needed infrastructure included "maintenance and improvement of existing roads, industrial road construction, rail line construction, deep water access and berthing facilities, and sewage facilities." (Italics added.) The report noted that "[a]ccess to most of the area is poor to nonexistent and infrastructure is inadequate to serve *planned industrial use*." (Italics ours.) It was also stressed that substantial portions of the project area lie within the 100-year flood plains of the Sacramento River and various creeks and are subject to flooding.[10] There was evidence that the levees protecting the project area from flooding are deteriorating and that the costs of maintaining them imposed a burden on property owners. Out of 171 parcels in the project area, 19 exhibited some form of structural blight.[11] As previously noted, the redevelopment agency concluded "[t]he California redevelopment process is necessary to remove the blighting factors *which are hindering the full economic utilization of the land*." (Italics added.)

■ If one adopts this report's frame of reference, and evaluates any sizeable rural area for a highly intensive industrial use, the land will invariably be found to be blighted. What is missing from the redevelopment agency's report and from the record taken as a whole is evidence that the asserted blighting conditions substantially burden the *existing uses* of the area for agriculture.

---

[10]Respondents repeatedly emphasized the negative effects of flooding on the residents of Collinsville and Birds Landing. What they overlook is the fact that those very residents were nearly unanimous in their opposition to the redevelopment project. In light of their strong opposition, the Towns of Collinsville and Birds Landing were exempted from the eminent domain portion of the proposed plan.

[11]Structural blight was defined as housing units evidencing age, obsolescence, deterioration, dilapidation, mixed character and shifting uses.

There is no showing in this case that the occasional flooding and lack of infrastructure has rendered the land stagnant or unproductive.[12] To the contrary, a study of land use alternatives for the project area states "these lands are not marginal agricultural lands ... their productivity and efficiencies compare well with other agricultural areas in the region." This report goes on to state that production comparisons with other dry land farming areas in California indicate "that the planning area may be one of the *most productive*." (Italics added.) There is no evidence the land is dropping in value or that the property has become a serious economic burden to the taxpayers of the county. The redevelopment report states that no specific social problems exist in the project area. While it cannot be denied that the project area would benefit from improved roads, levee repairs, sewage improvements, and other public projects envisioned by the redevelopment plan, there is no showing that the lack of such improvements has unduly burdened the existing agricultural use of the area. In the words of *Sweetwater*, there was no showing the blighting conditions had "ended [the land's] present economic use." (*Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d at p. 279.) It should also be noted that this agricultural land provides the statutorily recognized benefits of providing open space, healthful and nutritious food, and an economic resource to the state. (Gov. Code, § 51220; see *Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 850-851 [171 Cal.Rptr. 619, 623 P.2d 180].)

Overall, the thrust of the information compiled on the project area is that Solano County will be improved if the land is developed for water-related industry rather than allowing it to remain in agricultural use. While this determination might be pertinent to the adoption of the area plan and to changes in land use designations from agricultural to industrial, it is irrelevant to a determination of blight. (See *Sweetwater Valley Civic Assn.* v. *City of National City, supra,* 18 Cal.3d at p. 277-278; *Regus* v. *City of Baldwin Park, supra,* 70 Cal.App.3d at p. 979.)

Moreover, it is the declared policy of this state that even though the area is blighted, it should not be subject to the redevelopment process unless redevelopment could not reasonably be expected by private enterprise acting alone. (Health & Saf. Code, § 33032.) The record reveals that the vast majority of the project area is already owned by large, well-financed private interests. The fact that private development did not occur immediately after the project area's change in land use designation to permit industrial uses is not necessarily due to a need for public participation and assistance. We

---

[12] It is asserted by amicus Farmers and Residents of Montezuma Hills that occasional flooding can actually be beneficial to farmers. "Occasional partial submersion generally benefits land used for dry farming, which can be harvested or grazed on months after the high water subside. Silts and organic debris can nourish the soil."

may safely assume these corporations are holding the land for future development, and they will develop it when they can see a profit.[13]

In conclusion, although the project area exhibited some of the conditions of blight enumerated in the Community Redevelopment Law, there was no showing these conditions had substantially interfered with the land's present agricultural use or that the conditions had rendered the project area a serious social or economic liability to the community. Instead, respondents have admitted forthrightly that the redevelopment plan was devised and adopted as a funding mechanism to "implement" the area plan after anticipated industrial development failed to occur.[14] In other words, the record reveals the redevelopment process was being utilized, not to overcome blight, but to overcome problems attracting industry to the area. Such a purpose is insufficient to justify unleashing the "extraordinary powers" of redevelopment. (*Regus* v. *City of Baldwin Park, supra,* 70 Cal.App.3d at p. 979.)

Although the conclusion that the project area was not blighted necessitates reversal of the judgment and makes resolution of the remaining issues unnecessary, a few general comments on the environmental review process undertaken by respondents are in order. Appellant raises a number of technical deficiencies under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) However, her overriding objection concerns respondents' use of existing environmental impact reports (EIR's) and planning documents to analyze the environmental impacts of the redevelopment plan. Appellant claims the procedure employed by respondents failed to inform the public and governmental decisionmakers of the environmental consequences of carrying out the redevelopment plan.

■ CEQA was enacted by the Legislature to ensure " ' "that environmental considerations play a significant role in governmental decision-

---

[13] Indeed, the record reveals there have been several attempts at development which have been abandoned for reasons totally unrelated to the condition of the project area. Pacific Gas and Electric considered constructing a power plant on the upland portion of its site but determined it was infeasible "primarily due to legal rather than technical factors." In 1974 Dow Chemical Company proposed building a plant on its 2,700-acre site. This proposal was withdrawn in 1977 after a protracted and unsuccessful effort to secure the necessary permits. The ARCO Chemical Company proposed building a plant on 4,000 acres adjacent to the Dow site, but the proposal was withdrawn in 1978 due to a projected insufficiency in demand for the product. Similarly, plans to build a steel mill on a 4,000-acre site were dropped primarily because of adverse conditions in the marketplace.

[14] Respondents have repeatedly argued that the "adoption of the Redevelopment Plan amounted to no more than a reaffirmation and partial implementation of the previously discussed, evaluated and adopted Area Plan. The . . . Redevelopment Plan simply provided a new legal entity with which to implement the Area Plan." This attitude ignores that redevelopment is an extraordinary remedy that allows private property to be taken from one person through the power of eminent domain and transferred through the redevelopment agency to a private developer, all at public expense.

making." ' " (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029].) CEQA is essentially an environmental full-disclosure statute, and the EIR is the method of disclosure. (*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1020 [192 Cal.Rptr. 325].) An EIR "demonstrate[s] to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66].)

A redevelopment plan falls within the scope of CEQA. (Health & Saf. Code, § 33352, subd. (i).) "An EIR submitted to a redevelopment agency must serve as the 'alarm bell' alerting the agency to potential adverse environmental impacts arising from projects designed to improve the environment in blighted areas." (*Dusek* v. *Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1036-1037 [219 Cal.Rptr. 346].) It is undisputed that in the instant case a formal EIR analyzing the environmental effects of the redevelopment plan was neither prepared nor submitted for public review by respondents. Respondents contend, however, that the environmental consequences of the redevelopment plan were adequately analyzed by various planning documents and EIR's already in existence.

CEQA Guidelines establish that an agency "may use an earlier EIR prepared in connection with an earlier project to apply to a later project, if the circumstances of the projects are essentially the same. . . . [H]owever, it must find that the environmental effects of the projects are similar enough to warrant the same treatment . . . ." (Cal. Admin. Code, tit. 14, § 15068.)[15] In administering its responsibilities under CEQA, respondents prepared a five-page initial study concluding that nineteen previously prepared EIR's and planning documents spanning the course of eight years adequately addressed the environmental impacts of the redevelopment plan. These 19 documents contain well over 2,000 pages. Some of the documents deal with relatively general subjects such as the area plan; other documents discuss specific projects such as Dow Chemical's ill-fated plant proposal. The vast majority of these documents analyze geographic areas much larger than the 10,350-acre redevelopment project area. The initial study makes no attempt to summarize the anticipated environmental effects of the redevelopment plan nor does it make an attempt to cite specifically where this information can be found. An interested citizen is faced with laboriously sorting through over 2,000 pages of raw data and then drawing his or her own conclusions about which information is pertinent to this project's likely effect on the environment.  ■  Assuming arguendo that respondents were entitled to

---

[15] Unless otherwise noted, reference to CEQA Guidelines are those in effect before November 29, 1983, the date on which respondents were required to comply with the 1983 amendments. (See present day Cal. Admin. Code, tit. 14, § 15007, subds. (b) and (c).)

rely on existing environmental documentation, *at a very minimum* they should have compiled "all the relevant environmental data into a single format report, a procedure which would facilitate both public input and the decisionmaking process." (*Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 168 [118 Cal.Rptr. 490]; see also *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 171-172 [217 Cal.Rptr. 893].)

The Supreme Court has recently stressed the " ' "privileged position" that members of the public hold in the CEQA process.' " (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn., supra,* 42 Cal.3d at p. 936.) And, as already indicated, compliance with the EIR provisions of CEQA serves the important function of enabling the public to make an "independent, reasoned judgment" about a proposed project. (*Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 831 [173 Cal.Rptr. 602].) These purposes were ill served by the procedures employed by respondents. The initial study in this case provided the public with no meaningful opportunity to learn the environmental consequences of this redevelopment project. If anything, the sheer bulk of material an interested citizen was referred to, without any guidance on how to proceed, served to discourage rather than encourage participation in the public review process. In summary, neither the procedure followed by respondents nor the opportunity for citizen input was sufficient to constitute substantial compliance with the requirements of CEQA.

The judgment is reversed.

Low, P. J., and King, J., concurred.