121 Cal.Rptr.2d 649 (2002)
99 Cal.App.4th 424
William GRABER et al., Plaintiffs and Respondents,
v.
CITY OF UPLAND et al., Defendants and Appellants.
No. E029769.
Court of Appeal, Fourth District, Division Two.
June 18, 2002.
*650 James L. Markman, City Attorney; Richards, Watson & Gershon, Gregory M. Kunert and T. Peter Pierce, Los Angeles, for Defendants and Appellants.
C. Robert Ferguson, Claremont, for Plaintiff and Respondent William Graber.
Law Offices of Kathryn Reimann and Kathryn Reimann, Monterey; Alan K. Marks, County Counsel, and Michelle Blakemore, Deputy County Counsel, for Plaintiff and Respondent County of San Bernardino.

OPINION
HOLLENHORST, Acting P.J.
On June 28, 1999 the Upland City Council adopted ordinances 1683 and 1684. Ordinance 1683 amended the existing Town Center redevelopment plan by deleting 77 acres from the redevelopment area. Ordinance 1684 approved a new redevelopment plan, designated Project No. 7. Project No. 7 contained the 77-acre parcel, as well as 15 other noncontiguous parcels.
Plaintiffs William Graber and the County of San Bernardino (County) filed separate validation actions to challenge the two ordinances. The actions generally contend that the ordinances are invalid because the City of Upland (City) failed to comply with provisions of the Community Redevelopment Law (Health & Saf.Code, § 33000 et *651 seq.).[1] The actions were subsequently consolidated for all purposes. (Code Civ. Proc, § 865.)
Mr. Graber's complaint alleged that the 77-acre parcel had been unlawfully merged with the new redevelopment area, in violation of section 33354.6. He also alleged that Project No. 7 did not meet statutory requirements because at least 20 percent of the area included in Project No. 7 was not urbanized (§ 33320.1), nonblighted property had been improperly included in the project area (§§ 33321, 33367, subds.(d)(9) & (10)), and noncontiguous property had been improperly included in the project area. (§§ 33320.2, subd. (a)(2), 33367, subd. (d)(9).) Mr. Graber also alleged that the City's finding of blight was not supported by the evidence, in violation of sections 33030, 33031, and 33367. Other causes of action were also alleged.
The County alleged that ordinance 1683 was invalid because it violated article XVI, section 16 of the California Constitution and statutory provisions relating to tax increment financing. The County alleged that ordinance 1684 was invalid because the project area described in that resolution did not meet the statutory definitions of a blighted area, and the project area was not predominately urbanized. The County also asserted several other causes of action.
The trial court agreed with the challengers and invalidated ordinances 1683 and 1684. The City appeals.

THE TRIAL COURT DECISION
The trial court found that ordinance 1683 violated the constitutional provision relating to tax increment financing, as well as various statutes. Although the ordinance provides that the City was amending the original redevelopment plan for the Town Center redevelopment project, the trial court noted that the ordinance specifically states: "`... [T]he sole purpose of the Amendment is to reassign certain parcels from within the territory included in the Original Project Area to the area included within the proposed Upland Redevelopment Project No. 7.'"
Section 33450 specifically provides that redevelopment plans may be amended to exclude land from the project area. However, the trial court agreed with the County's argument that the purpose of the reassignment was to obtain a new base tax year for the 77-acre parcel, and that such a purpose was an improper purpose under "the constitution and the intent of the CRL." The trial court therefore voided ordinance 1683.
The trial court also found that ordinance 1684 violated several statutory provisions. First, the trial court found that the project area was not predominantly urbanized, as required by sections 33030, subdivision (b)(1) and 33320.1. The trial court focused on subarea O, an area which the City counted as urbanized because it claimed that the property had previously been developed for urban uses. The court rejected the argument that the former uses of the property as a rock mine and dump were urban uses. Considering the evidence in the record on this issue, the trial court found a lack of evidence that subarea O had been previously developed for urban use. With the exclusion of that subarea, the remaining area was less than 80 percent urbanized. The project area therefore was not predominantly urbanized under the definition of section 33320.1, subdivision (b).
*652 Second, the trial court found that the physical evidence did not support the City's contention that the various subareas were blighted within the meaning of sections 33320.2 and 33030, subdivision (b)(2)(A). In doing so, it found that the record was similar to the record in our case of County of Riverside v. City of Murrieta (1998) 65 Cal.App.4th 616, 627, 76 Cal.Rptr.2d 606: "Although the report speaks in the statutory language used to define blight, the report offers little concrete evidence of actual conditions of blight."
Third, the trial court found that substantial evidence did not support the City's conclusion that there was physical blight consisting of unsafe or unhealthy buildings within the meaning of section 33031, subdivision (a)(1). In doing so, it relied on Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency (2000) 82 Cal.App.4th 511, 551-552, 98 Cal. Rptr.2d 334. Specifically, it found that in this case, as in Mammoth, "[t]he breadth of the definition used in the building survey prevented the town council from determining whether the Project Area could truly be characterized as containing buildings unsafe for human occupancy due to their deteriorated or dilapidated condition." (Id. at p. 551, 98 Cal.Rptr.2d 334.)
Fourth, the trial court found a lack of substantial evidence of factors preventing an economically viable use of the subarea properties, as required by section 33031, subdivision (a)(2). In doing so, it again relied on the discussion in the Mammoth case and found that "[n]one of the conclusions drawn by the City are supported by economic data as to any parcel within the subarea[s]." With regard to subarea O, the trial court found that it was being developed for a master planned community and that "the alleged delimiting site preparation factors had no bearing on the economically viable use of the site."
The trial court thus found a lack of substantial evidence of blight in the project area, i.e., "there is no substantial evidence to support the City's Redevelopment Project No. 7 project area as predominantly urbanized and suffering from at least one of the statutory physical blight conditions." It therefore voided ordinance 1684.

ISSUES AND STANDARD OF REVIEW
The first issue presented for decision is whether the trial court was correct in voiding ordinance 1683 on grounds that it violated the constitutional and statutory provisions relating to tax increment financing. The parties agree that this is a legal issue subject to an independent review. (Redevelopment Agency v. County of Los Angeles (1999) 75 Cal.App.4th 68, 74, 89 Cal. Rptr.2d 10.)
The second issue is whether the trial court correctly found a lack of substantial evidence to support the City's findings of blight under section 33367, subdivision (d)(1). The parties do not discuss the subtleties of this determination in a case in which the trial court disagrees with the City's findings.
We discussed the issue at length in Murrieta. In that case, the City had approved the project on a number of grounds. The County of Riverside challenged the City's approval of the project. The trial court found in favor of the County "on the grounds that the record did not contain substantial evidence to support the City's findings that the project area is a `predominantly urbanized area ... which is a blighted area.' [Citation.]" (County of Riverside v. City of Murrieta, supra, 65 Cal.App.4th 616, 619, 76 Cal.Rptr.2d 606.) Applying the substantial evidence test in *653 this situation, we noted that "[t]he distinction is somewhat elusive between whether substantial evidence supports the City's determination or whether substantial evidence supports the trial court's finding that there is no substantial evidence to support the City's determination." (Ibid.)
After discussing several cases, we concluded by saying "that the proper standard of review requires us to decide whether substantial evidence supports the judgment of the trial court regarding the City's two ultimate determinations in this case: 1) that the project area is predominantly urbanized, and 2) that the project area is blighted." (County of Riverside v. City of Murrieta, supra, 65 Cal.App.4th 616, 620, 76 Cal.Rptr.2d 606.) Finding no substantial evidence of urbanization or blight in the administrative record, we agreed with the trial court's determination that no substantial evidence supported the City's determination of urbanization and blight, and we therefore affirmed the judgment.
Our Supreme Court discussed the substantial evidence rule in redevelopment cases in In re Redevelopment Plan for Bunker Hill (1964) 61 Cal.2d 21, 37 Cal. Rptr. 74, 389 P.2d 538. In that case, the trial court applied the substantial evidence standard of review and declined to exercise its independent judgment on the issues, including the issue of blight. The Supreme Court upheld the trial court's determination, holding that "the trial court was correct in its refusal to reweigh the evidence and in confining itself to determining whether the findings and determinations of the inferior bodies were supported by substantial evidence. [Citation.]" (Id. at p. 40, 37 Cal.Rptr. 74, 389 P.2d 538.)
We therefore review the administrative record to determine whether we agree with the trial court's determination that the City's findings of urbanization and blight are not supported by substantial evidence. Of course, we independently determine the law applicable to the facts in the administrative record: "The Community Redevelopment Law has established factors to be considered in determining whether an area is blighted, and it is the court's role to ensure those factors are taken into account. In short, the courts are required to be more than rubber stamps for local governments." (Emmington v. Solano County Redevelopment Agency (1987) 195 Cal.App.3d 491, 498, 237 Cal.Rptr. 636.)
Accordingly, "the Community Redevelopment Law requires substantial evidence in the administrative record demonstrating the existence of specific characteristics of urbanization and blight. (Health & Saf.Code, §§ 33030, 33031, 33320.1.) In some instances, the statute requires a finding of a nexus, to borrow a term from takings jurisprudence, between a particular characteristic being reviewed and the actual condition being caused. If the specific finding required by the Community Redevelopment Law cannot be made from the evidence in the administrative record, the evidence is not `"substantial" proof of the essentials which the law requires' and the finding is not supported by substantial evidence. [Citation.]" (Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal.App.4th 511, 538, 98 Cal.Rptr.2d 334.)

ORDINANCE 1683
As noted above, the trial court found that the deletion of the 77-acre parcel from the existing Town Center redevelopment project was invalid because it was done for an improper purpose, i.e., to change the base year value of the parcel.
California Constitution, article XVI, section 16, provides that the Legislature may *654 provide that a redevelopment plan may contain a provision for dividing the property taxes attributable to the property in the project area between various taxing agencies. The Legislature has implemented the provision by enacting a nearly identical statute, section 33670.
"Increment revenue, which is the primary source of funding for redevelopment projects, consists of the increased property tax revenue resulting from rises in the assessed valuation of property in a redevelopment project area. Taxing agencies continue to receive the amount of revenue they would have received under the assessed valuation existing at the time the project was approved, while the additional revenue attributable to the project is placed in a special fund of the redevelopment agency for repayment of indebtedness incurred in financing the project. [Citation.]" (County of Santa Clara v. Redevelopment Agency (1993) 18 Cal. App.4th 1008, 1011, 22 Cal.Rptr.2d 868.)
The property placed in a redevelopment project area is thus frozen at its assessed value upon the last equalized assessment roll before the adoption of the ordinance establishing the project, and further increases in the assessed value produce tax revenues which are used to pay off the loans which were used for the improvements which produced the increased assessed values. (Rev. & Tax. Code, § 2050 et seq. See, e.g., Redevelopment Agency v. County of Los Angeles, supra, 75 Cal. App.4th 68, 89 Cal.Rptr.2d 10, and Redevelopment Agency v. County of San Bernardino (1978) 21 Cal.3d 255, 145 Cal. Rptr. 886, 578 P.2d 133.)
In this case, however, the properties in the Town Center redevelopment project lost value after being placed in the project area with the result that there were no tax increment funds available to pay for improvements. Thus, the project was effectively stalled. To remedy the situation, the City's redevelopment consultants recommended the deletion of the lowest assessed value properties from the project and their reassignment to a new project area. It was intended that this maneuver would result in new base year values which would reflect the decline in assessed values. Accordingly, more tax increment would be generated to pay for redevelopment.[2] Conversely, the County would lose tax revenues because of the lower base year values. As noted above, the County *655 contends this is a subterfuge and improper purpose which invalidates the ordinance. The trial court agreed.
The City maintains its actions were proper because (1) section 33450 expressly allows it to delete properties from a redevelopment area and (2) nothing in the redevelopment law prevents it from designating those properties for inclusion in a new project area if they meet the statutory criteria.[3] In other words, the City contends that the fact that a property was once in a project area does not forever preclude it from being designated as part of another project area so long as blight exists. If the practical effect of the deletion and reassignment is unfair to the County, the City contends that the issue is a question for the Legislature, and it should not have been the concern of the trial court. The City cites Redevelopment Agency v. County of Los Angeles, supra, 75 Cal.App.4th 68, 89 Cal.Rptr.2d 10, which emphasizes that fairness issues connected with tax increment financing should be addressed to the Legislature. (Id. at pp. 74-75, 89 Cal.Rptr.2d 10.)
The City also argues that the trial court's holding is based on the erroneous premise that the 1992 assessed base year value applies to all parcels in the project area for the 40-year life of the redevelopment project. The City claims the premise is erroneous because properties may be deleted from the project area and, in that event, the 1992 base year value would no longer be applied. It gives examples of subsequent changes that support the conclusion that the assessed value of property in the redevelopment area must be recalculated under certain circumstances. (See, e.g., Redevelopment Agency v. County of San Bernardino, supra, 21 Cal.3d 255, 261, 145 Cal.Rptr. 886, 578 P.2d 133.)
The County argues that the trial court properly voided ordinance 1683 because the City's purpose was improper. Under the Constitution, the 1992 equalized assessment roll must be used to determine the base year value. The purpose of the amendment was to change the base year value for the properties in the 77-acre parcel to a more current base year, in alleged violation of the constitutional provision and the applicable statutes. The County is also concerned that such "reassignment" could be used to evade the statutory time limits on redevelopment activities because the property would begin a new 40-year redevelopment period in the new redevelopment area No. 7. It concludes: "The net effect would be to allow redevelopment agencies to ignore the requirement that they receive only tax revenues which are greater than those generated prior to the time the agencies instituted redevelopment activities."
In short, the County concedes that the ordinances were based on the law, but contends that ordinance 1683 is invalid because its stated purpose was an improper one. It analogizes the situation to the termination of an at-will employee. Although such an employee may be terminated, the termination may not be for an improper reason. (Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, 1094, 4 Cal. Rptr.2d 874, 824 P.2d 680, overruled on other grounds in Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 80, fn. 6, 78 Cal.Rptr.2d 16, 960 P.2d 1046.) As Gantt notes, "while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no *656 right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." (Gantt, supra, at p. 1094, 4 Cal.Rptr.2d 874, 824 P.2d 680.)
Although the issue is a close one, the City's candid statement of its reasons for adopting ordinance 1683 makes it clear to us that the sole purpose of the ordinance was to avoid the base year limitations for the 77-acre parcel. We agree with the trial court that this is an improper purpose which conflicts with the statutory scheme.
Initially, we disagree with the City's characterization of the trial court's decision as including an implied finding that the County was entitled to the original 1992 base year assessed values for the life of the project. The trial court did not so find. It merely found that the City's purpose was improper and, for that reason, it voided the ordinance.
The base year assessed values can be changed in some circumstances, such as when a public agency condemns and acquires property in the redevelopment area. (Redevelopment Agency v. County of San Bernardino, supra, 21 Cal.3d 255, 145 Cal. Rptr. 886, 578 P.2d 133.) In the San Bernardino case, our Supreme Court held that in such a situation, the term "taxable property" as used in article XVI, section 16 means currently taxable property, and the assessed values are redetermined accordingly. Thus, if the 77-acre parcel had simply been deleted from the project area, we assume, without deciding, that it would have been appropriate to redetermine the assessed values of the total remaining property accordingly.
But the road the City took was not just a simple deletion. Instead, it did what was legally permitted for an improper reason. As the trial court found, the reason was improper because the City was attempting to do indirectly what it could not do directly, i.e., change the base year assessment of the subject parcel and the time it was in redevelopment. Such a change would certainly upset the tax distribution balance between the redevelopment agency and other taxing jurisdictions. For example, the Legislature enacted section 33607.5 in 1993 to prevent redevelopment agreements with school districts and redevelopment projects in areas which were not truly blighted. (Stats.1995, ch. 141, § 1.) It thus continued to fine tune the distribution of tax funds. (§ 33607.5. See also § 33333.2.[4]) This balance would be upset if the City were able to unilaterally change the base year assessed value of properties in a redevelopment area by simply deleting them from the area and reassigning them to a new area. Similarly, we agree with the County that the reforms enacted by SB 1290 in 1993 could be easily circumvented if we sanctioned the "reassignment" procedure here.
We therefore agree with the County that the attempted reassignment of properties from one project area to another was an improper attempt by the City to do indirectly what it could not do directly. The trial court therefore acted properly in voiding ordinance 1683.
The City contends that the deletion of the 77 acres accomplished by ordinance section 1683 should stand if we uphold the invalidation of ordinance 1684. It contends that a simple deletion is clearly authorized by the statute, and the 77-acre parcel should remain deleted from the Town Center redevelopment area even if we prevent its reassignment to Project Area No. 7.
*657 We disagree. As discussed above, the trial court voided ordinance 1683 because its purpose was improper. We have agreed with this determination. Since the purpose was improper, the ordinance cannot stand. However, this does not mean that the City could not now act to delete the 77-acre parcel from the Town Center redevelopment area for good and sufficient reasons.

ORDINANCE 1684
Ordinance 1684 finds that the project area is predominantly urbanized and blighted. Mr. Graber and the County contend that the ordinance must be invalidated because there is a lack of substantial evidence in the record to support these conclusions.
The Community Redevelopment Law is aimed at the elimination of blight. A blighted area is defined as one which is predominantly urbanized "and is an area in which the combination of conditions set forth in Section 33031 is so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b)(1).)
Since the trial court found a lack of substantial evidence on the issues of whether the project area (1) is predominantly urbanized and (2) blighted within the meaning of section 33031, we examine each issue seriatim.
1. Predominantly Urbanized. "In order to qualify as a redevelopment project area, section 33320.1 requires that the project area be predominantly urbanized, which in turn means that 80 percent of the land must be developed for urban uses." (County of Riverside v. City of Murrieta, supra, 65 Cal.App.4th 616, 620-621, 76 Cal.Rptr.2d 606, fn. omitted.) The term "predominantly urbanized" includes land which "[h]as been or is developed for urban uses." (§ 33320.1, subd. (b)(1).)
As we held in the County of Riverside case, "the meaning of urban is not fixed, objective, or easily ascertainable." (County of Riverside v. City of Murrieta, supra, 65 Cal.App.4th 616, 623, 76 Cal. Rptr.2d 606.) In that case, we found that, even without a precise definition of the term, there was "a paucity of evidence in the administrative record to support a determination that the project area is predominantly urbanized." (Ibid.)
In Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal.App.4th 511, 98 Cal.Rptr.2d 334, the court discussed the issue further: "`Urban is defined as "of, relating to, characteristic of, or taking place in a city ... constituting or including and centered on a city ... of, relating to, or concerned with an urban and [specifically] a densely populated area ... belonging or having relation to buildings that are characteristic of cities...." [Citations.]' [Citation.] [¶] The term `urban' thus refers more to the location and `varying characteristics' of a use than to the type of use. [Citation.] For example, a residential dwelling can exist either in an urban area or in a rural area. In either locale, the dwelling can be large or small and, in this era, will likely be served by many public utilities. The fact that it is a developed dwelling does not make the dwelling an urban use. Rather, it is the location and characteristics of the dwelling and its environs that may make the use an urban use." (Id. at pp. 544-545, 98 Cal.Rptr.2d 334.)
Upland is not Mammoth Lakes. The City emphasizes that it is bounded by development *658 on all sides, that it is unquestionably part of an urban area, and that it is almost entirely built out. It thus argues that these factors must be considered in making an urbanization determination for any particular parcel. It cites Mammoth, but the cited page emphasizes that "the Legislature attempted to ensure a parcel line would not be used to allow vacant nonblighted lands to be included in redevelopment project areas." (Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal. App.4th 511, 544, 98 Cal.Rptr.2d 334.) Thus, the City of Mammoth misused its redevelopment power by including in its project area "undeveloped and obviously nonblighted land which is planned and approved for extensive private development." (Ibid.)
The primary dispute between the parties relates to subarea 0. As the City concedes: "Because subarea `0' is 380.4 acres in size, and therefore constitutes more than 20 percent of the land in the project area [citation], whether subarea `0' is urbanized determines the issue of whether the entire project area is predominantly urbanized."
Subarea O "was the site of a mining operation, Pacific Rock, which requested and was granted cancellation of its permits with the San Bernardino County Flood Control District office in 1985. Since that time, with the exception of one industrial user on a 3.5-acre lot, no investment or development has occurred on the site." "Investment and development have been impaired in Subarea 0 due to the high cost to develop the property. A dump area and a silt basin cover a large portion of the site requiring the excavation of potentially toxic and organic materials.... The subarea is now being considered for residential development."
Applying the Friends of Mammoth definition, the City finds that the rock mining site and the dump site are urban uses because they are located in an urban area. It contends that flood control and the dumping of trash and organic materials are part and parcel of the City's urban infrastructure. In other words, it argues that we "should not evaluate whether a particular subarea is predominantly urbanized without first recognizing the ... characteristics of the larger, surrounding geographic area."
The April 1999 preliminary report to the city council by its redevelopment consultant contains a brief discussion of the "predominantly urbanized" requirement. Although subarea O is essentially vacant, the preliminary report states that it was previously urbanized. (§ 33320.1, subd. (b)(1).) It finds that 171.3 acres of the project area were previously urbanized because they were used for a mining operation and a dump site. The May 1999 final report to the city council omitted this discussion, and contains no discussion of the predominantly urbanized requirement. Nevertheless, ordinance 1684 recites a finding of urbanization, "based upon the Agency's 1999 Report to the City Council ...." We therefore examine the rationale of the preliminary report more closely.
One of Mr. Graber's specific objections to the redevelopment plan concerned the omission of the "predominantly urban" discussion from the final report.[5] In its official response to this objection, the City said that the discussion was omitted because it was not required under section 33352. With regard to substance, it said *659 that the report found that 87.83 percent of the project was found to be predominantly urbanized under the urban use test of section 33320.1, subdivision (b). With regard to subarea 0, it said that 171.3 acres of that parcel were considered to be urbanized by historic record. Specifically, "This area was previously used by an industrial company and as a local dump site. A mining company operated on this site from 1958 to 1985.... As a result the 171.3 acres were considered to be previously urbanized." The trial court found no evidence in the record to support the 171.3-acre figure. An aerial photograph from the early 1980's was cited as evidence, but there was no explanation as to how the 171.3-acre figure was derived, whether from the photograph or otherwise.[6] The trial court found the photograph "extremely difficult to make sense of.... [¶] ... The only thing that the aerial photo does show is that subarea O is vacant land and was completely surrounded by undeveloped land as well."[7]
The trial court also raised a more significant issue of previous development. If, as Mammoth holds, the urban character of a property depends more on the property's location, characteristics and environs than its type of use, we should consider those characteristics based upon the status of the property at the time of the previous development. Thus, although we have been unable to find any authority discussing the issue, it seems that the question we must consider should be whether the rock mine and dump were developed for urban uses in the early 1980's. We therefore disagree with the City's argument that we must consider the current built-out condition of the City as showing the area is predominantly urban. Indeed, it appears from the aerial photograph that the area was primarily vacant land which was surrounded by vacant land in the early 1980's.[8] The area was also vacant at the time of a field survey in May 1998.
A rock mine and a dump can be located anywhere, and such uses are not necessarily urban uses. Nor are properties developed for mining, dump, and flood control uses necessarily developed for urban uses. As the County points out, a mine and a dumpsite are more likely to be associated with rural or nonurban areas than with urban areas. Flood control uses can be urban or rural.
We therefore agree with the trial court's conclusion that substantial evidence fails to support the City's conclusion that the 171.3 acres were previously developed for urban uses. As a result, there is a lack of substantial evidence to support the City's ultimate conclusion that more than 80 percent of the project area was predominantly *660 urbanized, as required by section 33320.1. The trial court correctly voided ordinance 1684 for this reason alone. However, we will briefly consider the evidence and arguments on the issue of blight.
2. Blighted. If an area is urbanized, it may be found to be a blighted area. (§ 33030.) A blighted area includes an area which has physical and economic conditions of blight, as defined in section 33031. Specifically, a blighted area is "[a]n area that is characterized by either of the following: [¶] (A) One or more conditions set forth in any paragraph of subdivision (a) of Section 33031 and one or more conditions set forth in any paragraph of subdivision (b) of Section 33031." (§ 33030, subd. (b)(2)(A).)
The major difference between the parties arises from their respective application of this definition.
The City contends that a project area must contain one condition of economic blight and one condition of physical blight. It therefore argues "each subarea of the project area need not satisfy all of the conditions which are indicia of physical blight nor all of the conditions which are indicia of economic blight. Indeed, a particular subarea may satisfy only one condition of either physical blight or economic blight, or, none at all if that subarea is necessary for effective redevelopment under section 33320.2 ...." After discussing each subarea, the City concludes: "In sum, of the 12 subareas identified as reflecting characteristics of blight, three suffer from both physical and economic blight, five suffer from physical blight only, and four suffer from economic blight only.... [T]he remaining three parcels totaling 18.9 acres are unblighted but are necessary for effective redevelopment."
The County contends that each of the 15 noncontiguous subareas must be blighted or necessary for effective redevelopment. In other words, it contends that each subarea have "at least one of the factors of physical blight and one of the factors of economic blight, and that the combination of these factors be so prevalent and substantial as to constitute a serious burden on the community which cannot be expected to be reversed without redevelopment ...."
We agree with the County. Section 33320.2, subdivision (a) provides, in relevant part: "The area included within a project and a project area may be either contiguous or noncontiguous. All noncontiguous areas of a project area shall be either blighted or necessary for effective redevelopment."[9] Since there is no contention here that the widely separated noncontiguous parcels were necessary for effective redevelopment, the noncontiguous parcels included in the project had to be blighted, no matter which parcel was selected as the primary parcel in the project area. As noted above, blighted areas are defined in section 33030 to include areas which contain at least one condition of physical blight and one condition of economic blight, as defined in section 33031. *661 We therefore reject the City's argument that we should ignore the statutory definition and hold that each subarea must only have some physical or economic blight.
Since the City concedes that only three subareas have both physical and economic blight, we agree with the County's conclusion that the City failed to produce substantial evidence of blight. Accordingly, the trial court correctly invalidated ordinance 1684.
The trial court also examined each subarea individually and found that substantial evidence does not support the City's findings of physical blight under each of the subsections of section 33031, subdivision (a). Without repeating that discussion, we note that a field survey identified 85.5 percent of the structures in the project area as deficient. "Deficient" is defined as "The structure has been maintained adequately to guard against any major structural defects. However, the structure does exhibit minor signs of deferred maintenance such as faded paint or sagging screens. The property is relatively well maintained and devoid of any accumulation of debris."
The practice of using exterior structural surveys has been criticized because a superficial survey may not result "in substantial evidence supporting the statutorily required elements of a blighted area." (Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal.App.4th 511, 539, fn. 8, 98 Cal.Rptr.2d 334.) In Gonzales v. City of Santa Ana (1993) 12 Cal.App.4th 1335, 16 Cal.Rptr.2d 132, a field survey of the exteriors of the structures resulted in a conclusion that 14 percent of the buildings were dilapidated. The other categories were not tightly defined, and the court found that "substantial percentages of `fair,' `old and obsolete,' and even `dilapidated' buildings are not enough, by themselves, to support such a finding [of blight]." (Id. at p. 1345, 16 Cal.Rptr.2d 132.) However, because of documented overcrowding and crime conditions, the court found substantial evidence of blight. (Id. at p. 1345, 16 Cal.Rptr.2d 132.)
In the present case, the consultant's report notes that the ratings were assigned on the basis of "a visual evaluation of the observable, exterior conditions of each building in the proposed Project Area." The report also states: "The field survey team had no legal authority to enter private property or review the interior condition of buildings; as such, this level of analysis was not undertaken."
In Beach-Courchesne v. City of Diamond Bar (2000) 80 Cal.App.4th 388, 95 Cal.Rptr.2d 265, the evidence of physical blight was found insufficient because "there is no indication that any of the affected parcels contains a building in which it is unsafe or unhealthy for persons to live or work. [Citation.]" (Id. at p. 398, 95 Cal.Rptr.2d 265.)
In the present case, the building survey placed the structures in the project area in one of four categories: sound, deficient, deteriorated, or dilapidated. As noted above, 85.5 percent of the buildings were placed in the deficient category. Sound buildings were 7.1 percent, deteriorated buildings were 7.2 percent, and dilapidated buildings were .2 percent.
The field survey found that buildings in the deteriorated and dilapidated categories were unhealthy or unsafe for persons to live and work in. But, under the definition used by the consultants, a building could be considered deteriorated if it had peeling paint or cracked fascia.[10] The more serious *662 category, dilapidated, had only four homes and one business.[11] Thus, only five structures out of 2,099 observed fell into this category, or .2 percent.
In County of Riverside v. City of Murrieta, supra, 65 Cal.App.4th 616, 76 Cal. Rptr.2d 606, we found insubstantial evidence of physical blight when the report identified less than 5 percent of the project area's structures as unsafe or unhealthy. This was not a sufficient condition of physical blight to constitute substantial evidence of blight. (Id. at p. 627, 76 Cal. Rptr.2d 606.) The same is true here.
The defect is the same as that found in Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal.App.4th 511, 98 Cal.Rptr.2d 334. In that case, the building survey found that 25 percent of the buildings in the project area were deteriorated or dilapidated.[12] But "the definition [of dilapidation] is overbroad. Peeling paint, dry rot, and lack of maintenance need not by themselves result in an unsafe or unhealthy building. The breadth of the definition used in the building survey prevented the town council from determining whether the Project Area could truly be characterized as containing buildings unsafe for human occupancy due to their deteriorated or dilapidated condition." (Id. at p. 551, 98 Cal.Rptr.2d 334.) "In short, the town council could not determine with reasonable certainty the existence or extent of buildings rendered unsafe due to deterioration or dilapidation based on the evidence in the administrative record." (Id. at p. 552, 98 Cal.Rptr.2d 334.) The same is true here, particularly because the combined percentage in the deteriorated and dilapidated categories here was only 7.4 percent.
The trial court also found that each of the subdivisions of section 33031, subdivision (a), which define varieties of physical blight, were not present here. That is, there was insufficient evidence of (1) unsafe or unhealthy buildings, as discussed above; (2) factors preventing economically viable use; and (3) adjacent incompatible uses. In view of our conclusions above, we find it unnecessary to discuss these issues further.

DISPOSITION
The judgment is affirmed.
We concur: RICHLI and WARD, JJ.
NOTES
[1] Unless otherwise indicated, all further statutory references are to the Health and Safety Code.
[2] The City's redevelopment consultants defined the problem as follows: "The reassignment of parcels is necessary because the Town Center Project Area is not generating tax increment. At the time a redevelopment plan is adopted it is assigned a `base year assessed value' by the State Board of Equalization and the County Assessor's Office. For Town Center, the base year is 1992. The base year assessed value reflects the total assessed value of all taxable properties that are located within the project area. It is the subsequent growth in assessed valuation that gives the Agency tax incrementthe difference between the base year valuation and current assessed value. The CCRL stipulates that if in any year the total assessed valuation of a project area drops below the base year value of the project area, the Agency is ineligible to collect tax increment. The Town Center Project Area has been assessed at a value of less [than] the base year value since its inception and no tax increment has been collected. Without increment, the projects which the City had planned to reduce blight in Town Center cannot ... be effectively implemented due to lack of funds. [¶] As a way of remedying the problem, the Agency is proposing to remove from Town Center the parcels that have demonstrated large declines in assessed valuation and reassign those parcels to the proposed Project Area No. 7. Project Area No. 7 will be assigned a base year (FY 1998-99) which with reference to the reassigned parcels would reflect lower assessed valuation. The Amended Town Center Project Area would be able to generate tax increment and the reassigned, still blighted parcels, would remain in a project area, thus eligible for Agency assistance."
[3] Mr. Graber contends that there was no finding made that the 77-acre parcel remained blighted. He thus argues that it was improperly included in Project Area No. 7 because there was no evidence it was blighted at the time it was "reassigned." In view of our other conclusions we do not need to consider this argument further.
[4] The County's request that we take judicial notice of section 33333.2 prior to its amendment in 2001 by SB 211 is granted.
[5] We note that Mr. Graber also faults the preliminary report for failing to include a map showing the total number of acres developed for urban uses and not developed for urban uses, as required by section 33344.5. In view of our conclusions, we do not need to discuss this alleged deficiency further.
[6] Subarea O consists of 380 acres. Mr. Graber finds that the 171 .3-acre is the total acreage for the dumpsite (31.22 acres), the silt basin (51.78 acres) and the area used for mining operations (88.3 acres). If this area is considered nonurbanized, the percentage of project area which is urbanized drops from 87.83 percent to 77.65 percent. Since the ordinance relied on the preliminary report, these percentages are based on the total acreage of 1478.51 stated in that report. The City uses a final total figure of 1644.5 acres. The difference is immaterial because subarea O is concededly more than 20 percent of the project area.
[7] As Mammoth points out, the 1992 amendments (SB 1711) were intended to curb the practice of including vacant land in a project area. (Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency, supra, 82 Cal.App.4th 511, 543-544, 98 Cal.Rptr.2d 334.) In that case, as in this, the land had been planned and approved for extensive private development.
[8] It therefore would not meet the alternative urbanization criteria of section 33320.1, subdivision (b)(3).
[9] Section 33320.2 also states that "An unblighted, noncontiguous area shall be conclusively deemed necessary for effective redevelopment if that area is being used predominantly for:[¶] (1) The relocation of owners or tenants from other noncontiguous areas in the same project area or from other project areas in the community. [U] (2) The construction and rehabilitation of low or moderate-income housing."

We also note that section 33320.2, subdivision (b) provides: "An unblighted, noncontiguous area shall be deemed not necessary for effective redevelopment if that area is included for the purpose of obtaining the allocation of taxes from such area pursuant to Section 33670 without other substantial justification for its inclusion."
[10] The "deteriorated" category was defined as follows: "The structure exhibits signs of structural deterioration such as peeling paint, cracked fascia, sagging roof, or crumbling foundation. The structure may appear to have leaky plumbing or hazardous electrical service evidenced by exposed wiring. Plastic tarpaulins or other visual evidence may indicate a leaking roof problem. The property is generally not well-maintained resulting in overgrown vegetation and/or an accumulation of trash and debris."
[11] The "dilapidated" category is defined as follows: "The building is structurally unsound and maintenance of the structure and grounds is nonexistent. Its fitness for human occupation is highly questionable and the state of deterioration and neglect is such that it could be a candidate for demolition."
[12] Although the definitions are not the same, the comparable figure here is 7.2 percent dilapidated and .2 percent deteriorated, for a total of 7.4 percent.